In re CF & I FABRICATORS OF UTAH, INC., et al., Reorganized Debtors.

(Colorado & Utah Land Company)

(Kansas Metals Company)

(Albuquerque Metals Company)

(Pueblo Metals Company)

(Denver Metals Company)

(Pueblo Railroad Service Co.)

(CF & I Fabricators of Colo., Inc.)

(CF & I Steel Corporation)

(The Colorado & Wyoming Railway Co.).

Bankruptcy Nos. 90B–26721 to 90B–26730.

United States Bankruptcy Court,
D. Utah,
Central Division.

Sept. 5, 1996.

Weston L. Harris, Steven T. Waterman, Ray, Quinney & Nebeker, Salt Lake City, UT, for the Reorganized Debtors.

Peter J. Kuhn, Office of United States Trustee, Salt Lake City, UT, for U.S. Trustee.

## MEMORANDUM DECISION RELATED TO MOTION DATED JUNE 10, 1996 FOR ORDER DIRECTING UNITED STATES TRUSTEE TO REFUND TO THE REORGANIZED DEBTORS FEES IMPROPERLY ASSESSED UNDER 28 U.S.C. § 1930(a)(6)

JUDITH A. BOULDEN, Bankruptcy Judge.

Before the Court is the Motion Dated June 10, 1996 for Order Directing United States Trustee to Refund to the Reorganized Debtors Fees Improperly Assessed Under 28 U.S.C. § 1930(a)(6) (Motion) filed by the reorganized debtors. The United States Trustee (UST) opposed the Motion. The Motion places at issue whether the newly created post-confirmation fee provided in 28 U.S.C. § 1930(a)(6) (the Amendment or 28 U.S.C. § 1930(a)(6)) should be applied to chapter 11 cases with liquidating plans confirmed and substantially consummated before January 27, 1996. After careful consideration of the arguments of the parties and an independent analysis of applicable case law, this Court concludes the UST's fees cannot be assessed in Chapter 11 cases with liquidating plans allocating all estate assets to creditors that were confirmed and substantially consummated prior to the effective date of the Amendment.

### HISTORY

An understanding of the history of these jointly administered cases is necessary to place in perspective the post-confirmation UST fee issue. The facts are undisputed.[1] CF & I Fabricators of Utah, Inc., a vertically integrated steel manufacturer, and nine related entities (collectively the Debtors or Reorganized Debtors) filed petitions seeking relief under Chapter 11 of the Bankruptcy

---

1. No evidence was presented at the hearing on the motion before the Court. Both parties are familiar with the events in these cases. The Court refers to the pleadings on file for the history of these proceedings.

Code on November 7, 1990. The Debtors' venture into Chapter 11 was driven by their need to resolve a substantial pension plan shortfall, and a variety of tax and environmental issues. Creditors filed more than 1,600 proofs of claim asserting in excess of $2,000,000,000 in claims against the estates.

The Debtors were able to propose the Debtors' and Railroad Trustee's First Amended and Restated Joint Plan of Reorganization Dated December 1, 1992 (*Plan*). The liquidating *Plan* is a lengthy, complex document. As eventually confirmed by the Court, the *Plan* contains sixteen classes of claimants. · *Plan*, Article III, ¶ 51. The *Plan* provides that the Debtors, with the exception of Kansas Metals Company and Colorado & Utah Land Company, sell the majority of their assets to New CF & I Steel, L.P., a newly created entity,[2] pursuant to the terms of an Asset Purchase Agreement. *Plan*, Ex.B, p. 1. The consideration paid to the Debtors for the sale of their assets under the Asset Purchase Agreement is a complex mix of cash, deferred payments and stock. It consists generally of cash in an adjusted amount of approximately $18,000,000 paid at closing; a deferred stock payment of 598,400 shares of the purchaser's parent corporation with additional five-year warrants to purchase additional shares; $67,500,000 plus interest payable over 10 years; and an assumption of certain liabilities. *Plan*, Ex.B, p. 9–15. The assets of Kansas Metals Company and Colorado & Utah Land Company, and the remaining assets of the Debtors who are parties to the Asset Purchase Agreement are required to be used, sold or leased in an orderly manner using such methods that would obtain the highest net value from the assets within a reasonable period of time. *Plan*, Article IV, ¶¶ 52–53.

After a lengthy confirmation hearing, during which more than 8,000 ballots were considered, the Court confirmed the *Plan* by order entered February 12, 1993. Various provisions of the *Plan* fix the rights of creditors with impaired claims. It also fully allocates to creditors all assets in the estates, including the proceeds of the Asset Purchase Agreement and the net proceeds of any operation of any Debtor post-confirmation. Some of the more significant provisions of the *Plan*, in general terms, are as follows.

Class 1 of the *Plan* deals with the Debtors' liability for retiree benefits by providing that the Debtors pay $872,000 into a fund on the effective date, · with additional substantial contributions thereafter.[3] Class 11 provides for certain of the Debtors' trade creditors by allocating up to $500,000 to the class for pro-rata distribution on the effective date.[4] Class 12 includes allowed unsecured creditors that would share pro-rata in a portion of the proceeds of the Asset Purchase Agreement and certain other assets.[5] The *Plan* also establishes various appeal funds related to litigation involving the Pension Benefit

2. New CF & I, L.P. is a limited partnership, the sole general partner of which is New CF & I, Inc., a wholly owned subsidiary of Oregon Steel Mills, Inc., and the limited partner of which is the Pension Benefit Guaranty Corporation.

3. The *Plan* requires the establishment of a Voluntary Employees' Beneficiary Association (VEBA) pursuant to section 501(c)(9) of the Internal Revenue Code to receive all distributions under the *Plan*. The Reorganized Debtors' post-confirmation report indicates that $872,000 was paid into the VEBA on or about the effective date. *Thirty-day Report* ¶ 16.c. New CF & I L.P. is also required to pay cash into the VEBA in the amount of $67.5 million plus 9.5% interest over ten years. *Plan*, Article III, ¶ 51, Class 1 & Exhibit C.

4. This class includes allowed convenience claims of trade creditors against each of the Debtors, with the exception of Kansas Metals Company. Members of this class include holders of allowed claims equal to or less than $1,500, and holders with allowed qualified claims greater than $1,500 but less than $15,000 who elects to be so treated by reducing the amount of their respective claims to $1,500. *Plan*, Article III, ¶ 51, Class 11. The Reorganized Debtors' post-confirmation report indicates that $396,111 was paid to this class on or about the effective date. Thirty–Day Report ¶ 16.

5. Allowed unsecured claims were divided into subclasses for each of the Debtors. The *Plan* provides that such claims are to receive from the appropriate Debtor a *pro rata* distribution of funds available (after certain other distributions) of the Debtor's consideration from the Asset Purchase Agreement and the net proceeds of the operation or liquidation of its remaining assets. *Plan*, Article III, ¶ 51, Class 12.

Guaranty Corporation (PBGC),[6] a fund to finance the Debtors' litigation against the PBGC,[7] and fixes a variety of bar dates.[8]

The *Plan* defines "Reorganized Debtors" as the Debtors on or after the effective date, including representatives of the Reorganized Debtors identified in the provisions of the *Plan* concerning governance of the Reorganized Debtors. *Plan,* Article I, ¶ 43. In addition, the *Plan* states that, upon confirmation, assets did not vest in the Debtors, but each Debtor's estate retained all of its property free and clear of liens except as provided in the *Plan,* subject to each Debtor's obligations under the *Plan.*[9] Finally, the *Plan* reserves the Debtors' right to amend or modify the *Plan* in accordance with the Bankruptcy Code. *Plan,* Article VII, ¶ 93.

On March 3, 1993, the effective date of the *Plan,* the officers and directors of the Debtors were released from their positions. The Debtors and the Official Unsecured Creditors' Committee (Creditors' Committee) agreed that the Reorganized Debtors should be governed by a committee comprised of some of the members of the former Creditors' Committee (Reorganized Creditors' Committee). *Plan,* Article IV, ¶ 54; *Confirmation Order,* p. 15 & Exhibit 2 (setting forth "Post–Effective Date Governance of the Reorganized Debtors").[10]

As of the effective date of the *Plan,* seven of the ten Debtors sold substantially all of their assets to New CF & I Steel, L.P. and ceased business operations. The three remaining Debtors continued to operate for four, five, and sixteen months, while their assets were liquidated. The last Debtor to cease business operations did so in July of 1994, and the last Debtor to substantially consummate its *Plan* did so almost two years ago. In the last two years, none of the ten Debtors have engaged in any business operations.

The Court has not entered an order of conversion or dismissal in any of the Debtors' cases, and none of the Debtors have requested that the Court issue a final decree. The Debtors remain under the jurisdiction of the Court to resolve claims issues, most of which involve claims of governmental entities or the

---

**6.** The PBGC appealed a variety of pre-confirmation rulings on the priority of its claims. The *Plan* creates three separate settlement funds which are funded by cash, including $1 million cash made available at the closing of the Asset Purchase Agreement, plus net sales proceeds from enumerated assets. The cash portion of the appeal funds was required to be placed in interest-bearing accounts to be disbursed only upon order of the Court. If the PBGC is successful in one or more of the appeal issues, and there is insufficient cash in a particular appeal fund to pay the PBGC because designated assets have not yet been sold or are sold for insufficient value, New CF & I, L.P. is required to contribute cash up to $2.5 million to make up the shortfall. If the PBGC's appeals are dismissed or determined adversely, cash in any particular appeal fund or any unsold assets go back to the estate to be distributed pursuant to the *Plan.* *Plan,* Article III, ¶ 51, Class 12.

**7.** The *Plan* provides for a litigation expense fund of "up to $750,000 to pay the attorneys' fees and expenses of the Reorganized Debtors to contest the claims of the ·PBGC on appeal...." *Plan,* Article VI, ¶ 82. This litigation expense fund is not part of the three PBGC appeal funds described above and in n. 6 *supra. Id.*

**8.** Bar dates were created for indemnification, fee claims, claims arising under the Coal Industry Retiree Health Benefits Act of 1992, claims against the Colorado and Wyoming Railway pursuant to 11 U.S.C. § 1171, and for other administrative claims. *Plan,* Article IV, ¶ 61–65.

**9.** The *Plan* states that:

Except as otherwise expressly provided in the Confirmation Order, property of the estates will not vest in the Debtors. After Confirmation, each Debtor's estate shall retain all of the property of its estate dealt with by the Plan free and clear of all Claims, liens, encumbrances, charges and other interests of creditors and equity security holders, except as provided in the Plan or in the Confirmation Order, and each Debtor will perform its obligations under the Plan.

*Plan,* Article VI, ¶ 76; *see Confirmation Order,* p. 11.

**10.** Several months after the Reorganized Creditors' Committee was instituted, the Committee concluded that it would be more efficient for an individual to handle oversight of the day-to-day operations and liquidation of the Reorganized Debtors' assets. An order was entered designating a Responsible Director to govern the business and affairs of each of the Reorganized Debtors. *Ex Parte Order Temporarily Approving Revised Provisions for Post–Effective Date Governance of the Reorganized Debtor; Order Granting Motion for Approval of Revised Provisions for Post–Effective Date Governance of Reorganized Debtors.*

PBGC, a public corporation. The United States Department of Labor and the PBGC have appeals pending to the United States District Court for the District of Utah that will probably be appealed to the United States Tenth Circuit Court of Appeals, and possibly, petitions for certiorari may be filed with the United States Supreme Court.[11] The Reorganized Debtors estimate that the Debtors' cases will continue under the jurisdiction of this Court, without dismissal, conversion or a final decree, for approximately four years to come.

On January 26, 1996, Congress passed an Amendment[12] to 28 U.S.C. § 1930 which provides that the UST may collect quarterly fees in a Chapter 11 case until conversion or dismissal of the case. In April of 1996, the Office of the UST assessed nine of the ten Reorganized Debtors fees of $250.00 each, and the tenth Reorganized Debtor, Reorganized CF & I Steel Corporation, fees of $3,750. Each of the Reorganized Debtors paid the UST the amount assessed. The Reorganized Debtors estimate that they may pay as much as $100,000 to the UST before seeking final decrees. The Reorganized Debtors were unable to identify which of the liquidated Debtors' assets have been used to satisfy the assessments that have been paid to the UST thus far.

The Reorganized Debtors filed their Motion asserting that the clear language of the Amendment makes it inapplicable to the Re-organized Debtors, (although conceding that the Reorganized Debtors are the same entities that filed the petitions in November of 1990) and that the Amendment is impermissibly retroactive. The UST filed a response to the Motion, arguing that the Reorganized Debtors misconstrue the principles of retroactivity, that the clear legislative intent of the Amendment supports the collection of the fees in these cases, and that the Amendment satisfies constitutional requirements.[13] Neither party has addressed the propriety of the relief requested by the Reorganized Debtors that seeks return of the fees previously paid to the UST. The UST has not raised as a defense that the claim asserted in the Motion is not property of the estate as set forth in 11 U.S.C. § 541(a)(7) entitled to be recovered pursuant to 11 U.S.C. § 549(a), nor that recovery is procedurally improper pursuant to Fed.R.Bankr.P. 7001.[14] Nor has the UST asserted 11 U.S.C. § 106 as a defense against the imposition of an order requiring the return of the fees. This Court has jurisdiction to resolve the issues pursuant to the *Plan*, Article IV, ¶66 and Article VI, ¶86.[15] However, such resolution must be consistent not only with the Bankruptcy Code and case law, but with the procedural requirements of the Bankruptcy Rules.

## ISSUE

Should the Amendment to 28 U.S.C. § 1930(a)(6) be applied to cases with substantially consummated liquidating plans allocat-

---

**11.** Most recently, the United States Supreme Court ruled on an issue involving a priority claim filed by the Internal Revenue Service. *United States v. Reorganized CF & I Fabricators of Utah, Inc, et al.,* —— U.S. ——, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996).

**12.** Balanced Budget Down Payment Act, I, Pub.L. No. 104–99, 110 Stat. 26, 37–38 (1996).

**13.** The UST also asserts that, because of the ruling in *United States v. Reorganized CF & I Fabricators of Utah, Inc., et,. al.,* —— U.S. ——, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), these issues may be moot because the Supreme Court's ruling likely requires the reopening of the cases for substantive actions beyond the scope of the existing *Plan* relative to claim determination and classification issues. This position misconstrues both the *Plan* and the Supreme Court's ruling. The only issue that was remanded for further action was the issue of the subordination of the Internal Revenue Service's claim pursuant to 11

U.S.C. § 510(c). The *Plan* provides for the eventuality that the Internal Revenue Service's claim may be reclassified from a subordinated claim in Class 13 to a Class 12 general unsecured claim.

**14.** At the hearing on the Motion, the Reorganized Debtors recognized that their Motion was procedurally improper because they seek an injunction in a contested matter. *See* Fed.R.Bankr.P. 7001. They prefer to characterize the Motion instead as a motion to aid in implementation of the *Plan*.

**15.** The *Plan* provides that the Court retains jurisdiction to enter such orders, judgments, injunctions, and rulings, to adjudicate claims and to resolve controversies and disputes regarding the interpretation and implementation of the *Plan*, and to enter a final decree closing the cases and making such final administrative provisions for the cases as may be necessary or appropriate.

ing all estate assets to creditors, that were confirmed prior to the Amendment's January 26, 1996 effective date?

## DISCUSSION

### Modification of the Substantially Consummated *Plan*

■ The UST is essentially requesting that the Reorganized Debtors, without the requisite formalities, modify the confirmed *Plan*. The UST seeks a modification to make provision for the payment of fees that were not applicable to the Debtors on the date that the *Confirmation Order* was entered or on the date that the *Plan* became effective. The UST essentially asserts claims arising after the expiration of all applicable bar dates, against funds already allocated to creditors with allowed claims.

■ The Bankruptcy Code prohibits the modification advocated by the UST. The Bankruptcy Code provides, in relevant part, that "[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan...." 11 U.S.C. § 1127(b). Only the plan proponent or the reorganized debtor, not the UST, has standing to attempt to modify a plan prior to substantial consummation. *Arthur Lipper Corp. v. Texas Int'l Co. (In re Texas Int'l Co.)*, 940 F.2d 1538, 1539 (10th Cir.1991) (unpublished decision) (only the reorganized debtor, as opposed to origi-

nal debtor, has standing to seek modification of a confirmed plan). *But see Bill Roderick Distrib., Inc. v. A.J. Mackay Co. (In re Mackay Co.)*, 50 B.R. 756, 760 (D.Utah 1985) (§ 1127(b) does not apply to entities who are not reorganized debtors or plan proponents). A confirmed plan can only be modified prior to substantial consummation. *See* H.R.Rep. No. 595, 95th Cong. 1st Sess. 411 (1977) (modifications "must be proposed before substantial consummation of the plan"); *Findley v. Blinken (In re Joint Eastern & Southern Dist. Asbestos Lit.)*, 982 F.2d 721, 747–48 (2d Cir.1992); *Goodman v. Phillip R. Curtis Enters. Inc.*, 809 F.2d 228, 233–34 (4th Cir. 1987); *In re Stevenson*, 148 B.R. 592, 595 (D.Idaho 1992); *In re Northampton Corp.*, 59 B.R. 963, 968 (E.D.Pa.1984); *In re Burlingame*, 123 B.R. 409, 411 (Bankr.N.D.Okla. 1991); 5 Collier on Bankruptcy ¶ 1127.02 (15th ed. 1995).

No one contests that the Reorganized Debtors' *Plan* is substantially consummated. *See* 11 U.S.C. § 1101(2) (defining "substantial consummation"). The *Plan* states that it can only be modified in accordance with the Bankruptcy Code. *Plan,* Article VII, ¶ 93. Under the plain language of 11 U.S.C. § 1127(b) and the *Plan*, the Court cannot modify the *Plan* to include provision for the payment of the UST fees.[16]

■ The Amendment to 28 U.S.C. § 1930(a)(6), which states absolutely nothing about modification of confirmed Chapter 11

---

16. The process of modification would be impossible for the Reorganized Debtors to fund under the *Plan*. Section 1126 requires that post-confirmation modification of a plan be effective only if (i) "circumstances warrant such modification ..." and (ii) the court, after notice and a hearing, "confirms such plan as modified, under section 1129 ..." 11 U.S.C. § 1127(b). The proponent of the modification is required to "comply with section 1125 ... with respect to the plan as modified." *Id.* at § 1127(c). The court is also required to fix a time in which holders of claims and interests can change their previous acceptance or rejection in light of the proposed modification. *Id.* at § 1127(d). The cases interpreting these provisions hold that modifications to a confirmed plan, such as the one suggested in these cases, require (i) notice of the proposed modification, (ii) information necessary for a creditor to assess the nature and impact of the modification, (iii) a hearing on the propriety of the pro-

posed modification and an opportunity for objection, and (iv) an assessment by the court that the plan, if modified, will meet the requirements of section 1129. *See, e.g., Universal Coop., Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149, 1156 (4th Cir.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). Notice of any modification to the *Plan* would be to all creditors, the Creditors' Committee, and the United States. Fed.R.Bankr.P.2002(a)(6)(i) & (j).

The expense that would be necessary to obtain confirmation of the material modification to the *Plan* proposed by the UST would be substantial, and, similar to the fees that the UST seeks to impose against the Reorganized Debtors, the *Plan* does not anticipate the need to fund such an expense. There is no ongoing business which could fund the expense of modifying the *Plan*. These facts confirm the rationale behind section 1126(b) that a confirmed plan cannot be modified after it has been substantially consummated.

plans, cannot override the express language of 11 U.S.C. § 1127(b) prohibiting the modification of substantially consummated plans. "It is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one....' *Morton v. Mancari,* 417 U.S. 535, 550–551 [94 S.Ct. 2474, 2482–2483, 41 L.Ed.2d 290] (1974)." *Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 U.S. 365, 375, 110 S.Ct. 680, 687, 107 L.Ed.2d 782 (1990). *See also U.S. v. Colacurcio,* 84 F.3d 326, 333 (9th Cir.1996); *NLRB v. A–Plus Roofing, Inc.,* 39 F.3d 1410, 1415 (9th Cir. 1994); *U.S. v. The Prescon Corp.,* 695 F.2d 1236, 1243 (10th Cir.1982). To allow such a result would significantly impair the integrity of the chapter 11 confirmation process, which this Court will not do. *See In the Matter of UNR Indus., Inc.* 20 F.3d 766, 769–70 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994) (discussing the sanctity of confirmed plans); [17] *In re Joint Eastern & Southern Dist. Asbestos Lit.,* 982 F.2d 721, 751 (2nd Cir.1992) (a "reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations nor to approve arrangements that some parties to the reorganization proceeding find preferable to the arrangements incorporated in a confirmed and consummated plan").

## Congressional Modification of 11 U.S.C. § 1127(b)

The position advocated by the UST mandates that 28 U.S.C. § 1930 be interpreted to not only modify the specific provisions of Title 11,[18] but also the contractual rights and obligations created by the confirmed and substantially consummated *Plan.* If the Court is to adopt this position, careful consideration must be given to the following factors: whether Congress evidenced a specific intent to make such drastic changes to the structure of Title 11; if so, whether, as applied to these cases, any such Congressional intent can withstand the long-standing prohibition against new statutes that retroactively modify established contractual rights; and finally, if equitable considerations weigh in favor of the UST's position.

The place to begin the analysis is the complete text of 28 U.S.C. § 1930 as amended:

**§ 1930. Bankruptcy fees**

(a) Notwithstanding section 1915 of this title, the parties commencing a case under title 11 shall pay to the clerk of the district court or the clerk of the bankruptcy court, if one has been certified pursuant to section 156(b) of this title, the following filing fees:

(1) For a case commenced under chapter 7 or 13 of title 11, $130.

(2) For a case commenced under chapter 9 of title 11, $300.

(3) For a case commenced under chapter 11 of title 11 that does not concern a railroad, as defined in section 101 of title 11, $800

(4) For a case commenced under chapter 11 of title 11 concerning a railroad, as so defined, $1,000.

---

**17.** In *Matter of UNR Indus,* the court stated that section 1127(b) preserves "interests bought and paid for in reliance on judicial decisions ..." and "it is the reliance interest engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things...." 20 F.3d 766, 769 (7th Cir.1994). The court goes on to state that:

Every incremental risk of revision ... puts a cloud over the plan of reorganization and derivatively over the assets of the reorganized firm. People pay less for assets that may be snatched back or otherwise affected by subsequent events. Self-protection through the adjustment of prices may affect the viability of the reorganization, and in any event may dis-

tort the allocation of assets away from the person who can make the most valuable uses of them and toward persons who are less sensitive to the costs of *ex post* changes of plans. By protecting the interests of persons who acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize *ex ante,* and thus produces benefits for creditors in the aggregate.

*Id.* at 770.

**18.** *See* discussion at pp. 991–92 *supra.* Arguably, the UST is also bound by the confirmed *Plan.* 11 U.S.C. § 1141(a). If so, the UST is barred from asserting a "claim" at this time. *See Plan* Article IV, ¶ 65.

(5) For a case commenced under chapter 12 of title 11, $200.

(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until a plan is confirmed or the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $3,000,000; $5,000 for each quarter in which disbursements total $3,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed. [Strike-out added.]

### Plain Language of the Statute

Three elements are evident from the unambiguous text of the statute. First, the entities responsible for paying fees assessed under 28 U.S.C. § 1930(a) are the parties commencing a case under title 11. *But see In re C n' B of Florida, Inc.*, 198 B.R. 836 (Bankr.M.D.Fla.1996) (quarterly fees are required to be paid by debtor-in-possession). This language is consistent with the operation of the statute prior to the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, that added subsection (6) to section 1930(a). Prior to the 1986 amendments, 28 U.S.C. § 1930(a) was drafted to collect the filing fee at the time the petition was filed from those parties who filed cases under Title 11. The language of the statute has never been modified to provide that post-filing UST's fees were to be paid by any party other than the parties commencing the case.[19]

■ The second element apparent from the unambiguous language of 28 U.S.C. § 1930(a)(6) is that the fee is not a charge or lien against 11 U.S.C. § 541 property. The statute merely states that the fee shall be paid. It is silent as to the source of the funds and does not require the fees originate from the estate. This silence, once again, is consistent with the pre–1986 statute that dealt with fees that were paid at the time of filing. If Congress had wanted 28 U.S.C. § 1930(a)(6) fees to encumber the post-filing estate, it could have so designated.

■ The third element obvious from reading the plain language of the Amendment is that fees assessed post-confirmation are to be paid only until the case is converted or dismissed, whichever occurs first. The UST takes exception to this reading of the statute, asserting that the statute's desired effect is to assess fees in confirmed chapter 11 cases *until a final decree is entered,* or the case is converted or it is dismissed, whichever occurs first. Any other interpretation, the UST asserts, would require the payment of the fees in perpetuity by debtors with confirmed chapter 11 plans in cases that were never converted or dismissed. However, the plain language of the statute indicates that Congress did not provide for the payment of fees in confirmed cases that are not converted or dismissed.

The plain reading of 28 U.S.C. § 1930(a)(6) that the fees apply only when a case is converted or dismissed has been adopted by three courts, although the UST asserts two of the cases are on appeal. *In re C n' B of Florida,* 198 B.R. at 838 ("Congress intended the fees to be paid in an aborted Chapter 11 case where the Debtor was unable to consummate a confirmed plan and the confirmed Chapter 11 is either dismissed or converted...."); *In re Jones,* Bankr No. 93–12631, 3–4, 1996 WL 571177 (Bankr.W.D.Tenn. June 20, 1996) (the plain meaning of the statute

---

**19.** There is no express statutory requirement for payment of quarterly fees from a chapter 11 trustee, or from a chapter 11 debtor in a case where the originating petition is brought pursuant to 11 U.S.C. § 303, but a subsequently adjudicated Chapter 11 debtor remains in possession. However, 28 U.S.C. § 1930(a) still applies to the majority of voluntary chapter 11 cases filed by debtors, and therefore fulfills the revenue generating purpose of the statute.

eliminates the need to look to legislative history and, since the pending cases were substantially consummated and not converted or dismissed, no quarterly fee was owed); *In re Northwestern Trading Co., Inc.*, Case No. 93–00029, 2–3 (Bankr.D.P.R. May 6, 1996) (since case had neither been converted nor dismissed after the confirmation of the plan, but rather debtor had completed payments under the confirmed plan, and the UST did not engage in any post-petition monitoring of the case, no fees were owed). These courts' interpretation of 28 U.S.C. § 1930(a)(6) to mean exactly what it says, do not result in the perpetual assessment of fees in cases where a final decree is issued, and do not require this Court to read "final decree" into the statute where it does not exist.

In the cases before the Court, the party responsible pursuant to 28 U.S.C. § 1930(a) for payment of any fee required to be paid by 28 U.S.C. § 1930(a)(6) is each of the Debtors who initiated Chapter 11 petitions in November of 1990. Although an argument can be made that these Reorganized Debtors are not the same entities that filed the cases,[20] counsel for the Reorganized Debtors have conceded that the post-confirmation entities are the same parties who commenced the cases.

The source of funding under the Amendment for the UST fees is not required to come from property of the estate. In these cases, property of the Debtors did not revest in a new entity upon confirmation, but instead remained property of the estate. *Plan*, Art. VI, ¶ 76.[21] Even though the Debtors' estates remain in existence post-confir-

mation, the proceeds from the liquidation of the Debtors' assets have been allocated to the various classes of creditors or otherwise fully committed by the *Plan*. To the extent that the three Debtors that continued to operate for up to sixteen months post-confirmation produced revenue, the net proceeds of those operations have also been committed to creditors pursuant to the *Plan*.

Nothing contained in the plain language of the Amendment indicates a specific Congressional directive to assess fees in successful confirmed chapter 11 cases, to modify the provisions of 11 U.S.C. § 1141 dealing with the effect of confirmation of a chapter 11 plan, or 11 U.S.C. § 1127 describing the method for modification of a confirmed Chapter 11 plan. Moreover, 11 U.S.C. § 1129(a)(12) only requires that UST fees deemed payable at "the hearing on confirmation of the plan. . . ." be paid on or before the effective date of the plan. Nothing in the language of the Amendment indicates that it was meant to alter cases with plans that have complied with 11 U.S.C. § 1129(a)(12) at the time they were confirmed. If Congress intended to change this procedure, it should have indicated that notwithstanding the requirement to pay fees at the confirmation hearing under 11 U.S.C. § 1129(a)(12), additional fees could be assessed under 28 U.S.C. § 1930(a)(6).[22] The plain language of the Amendment is also entirely consistent with the UST's argument that the "user fees" designed to generate additional revenue are justified because of increased UST oversight of confirmed cases that are subsequently converted or dismissed. Defaulted confirmed cases would require more UST super-

20. The Reorganized Debtors have no officers, directors or shareholders. They are governed only by a Responsible Director. Whether the original chapter 11 debtor constitutes the reorganized debtor must be decided according to the definitions in the confirmed plan. *See Arthur Lipper Corp. v. Texas Int'l Co., (In re Texas Int'l Co.)*, 940 F.2d 1538 (10th Cir.1991) (unpublished).

21. There is no need to analyze the issues that would be raised if no estate remained post-confirmation. *See e.g., In re Winom Tool & Die, Inc.*, 173 B.R. 613 (Bankr.E.D.Mich.1994) (property removed from bankruptcy estate upon confirmation order remained outside of estate following conversion to Chapter 7). *But see In re C n' B of*

*Florida*, 198 B.R. at 839 (implying that no funds are available from which unanticipated quarterly fees could be paid post-confirmation because after the entry of the order of confirmation there is no longer a debtor-in-possession but only a debtor and 11 U.S.C. § 1141 revests to the debtor all property of the estate free and clear of any claims and interest, except those provided for in the plan).

22. If UST fees could be assessed retroactively after the confirmation hearing, the feasibility of a plan could arguably be contingent on whether the plan set aside a fund to pay future assessments. Surely, this is not what was intended under 11 U.S.C. § 1129(a)(12).

vision and thus justify additional fees if the UST caused the confirmed cases to be dismissed or converted.

### Legislative History

In spite of the lack of any specific indication in the text of the Amendment to impose fees in cases that have not been dismissed or converted, or to modify Title 11, the UST argues that the Court should look beyond the language of the Amendment to modify the substantially consummated *Plan* and effect the desired result of creating an expanded source of funding for the UST. If this Court, even in light of the Supreme Court's admonition in *United States v. Ron Pair Enterprises Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) that if the language of the statute is plain no further inquiry is required, considered it appropriate to review the legislative history of the Amendment, the history provides little dispositive assistance. Nothing indicates that Congress intended that the fees be applicable to confirmed cases that are not converted or dismissed, or that Congress intended to modify 11 U.S.C. §§ 1127, 1129(a)(12) or 1141. A review of the legislative history surrounding the Amendment only supports the plain language on the face of the Amendment. *House Conference Report* No. 104–378, under a section entitled "United States Trustee System Fund," states:

> The conference agreement provides $102,390,000 in budget (obligational) authority for the U.S. Trustees, instead of $101,596,000 as proposed by the House and $103,183,000 as proposed by the Senate. Of this amount, the conference agreement provides that $44,191,000 [23] will be derived from anticipated offsetting collections. In addition, under section 111, the conferees agree to include an extension of post-confirmation quarterly fee payments made under Chapter 11 as proposed in both the House and Senate bills and expect that these fees will apply to all pending Chapter 11 cases with confirmed reorganization plans.

Elsewhere in the *Joint Statement,* under a section entitled "Department of Justice—General Provision," the following statement is made:

> Sec. 111.—The conference agreement includes section 111 as proposed in the House and Senate bills, which extends the quarterly fee payments for debtors under Chapter 11 of the Bankruptcy Code to include the period from when a reorganization plan is confirmed by the Bankruptcy Court until the case is converted or dismissed. The conferees intend that this fee will apply to both pending and new cases.

There is nothing contained in the legislative history that would indicate 28 U.S.C. § 1930(a)(6) was intended to authorize modification of a substantially consummated plan contrary to the provisions of 11 U.S.C. § 1127(b), allow the assessment of fees after the confirmation hearing in conflict with 11 U.S.C. § 1129(a)(12), or to alter the binding effect of confirmation provided in 11 U.S.C. § 1141. Neither is there any indication in the legislative history that the plain language regarding applicability of the fees in confirmed cases that are converted or dismissed was instead intended to mean that the fees applied in confirmed cases until eventually closed as a result of the issuance of a final decree. Certainly, conversion and dismissal of a case as set forth in 11 U.S.C. § 1112, and closing a case and issuing a final decree as provided in 11 U.S.C. § 350(a) and Fed. R.Bankr.P. 3022, are concepts familiar to Congress. The UST's position that 28 U.S.C. § 1930(a)(6) should be redrafted to include the term "final decree" is not supported by either the plain language of the statute or the legislative history.

### Retroactivity

Even if this Court was able to find support in the Amendment's legislative history for the UST's position that these Reorganized Debtors owe quarterly fees as of January 26, 1996 despite the fact that the *Plan*

---

**23.** The $44,191,000 contained within the compromised $102,390,000 was to be derived from offsetting collections. The fees from confirmed Chapter 11 cases were to be *in addition* to the $44,191,000 that comprised a portion of the total budget. Therefore, from the quoted legislative history, it is impossible to derive any understanding of the amount Congress intended to be generated from the new fees.

has been neither converted, dismissed, nor modified, the Court is prevented from so ruling by an application of the presumption against statutory retroactivity articulated in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The UST argues that the Amendment is not retroactive because plan confirmation is simply an antecedent fact and does not, by itself, trigger the requirement to pay quarterly fees; rather, being an open case does. This rather narrow interpretation of the applicability of the Amendment to these Reorganized Debtors is not supported by either the case law or the facts of these cases.

■ In *Landgraf*, the Supreme Court sets forth a series of policy considerations related to the retroactive application of statutes. Included is the elementary consideration of fairness that individuals should have an opportunity to know what the law is and to conform their conduct accordingly, that retroactivity is not favored, and that congressional enactments will not be construed to have retroactive effect unless their language requires such a result. *Id.* at ———— ——, 114 S.Ct. at 1496–97. *Landgraf* reiterates that the Fifth Amendment's Takings Clause prevents the Legislature from depriving private persons of vested property rights except for a "public use" and upon payment of "just compensation," and that the Due Process Clause also protects the interest in fair notice and repose that may be compromised by retroactive legislation. *Id.* at ——, 114 S.Ct. at 1497. Further *Landgraf* indicates "the largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions af-

fecting contractual or property rights, matters in which predictability and stability are of prime importance." *Id.* at ——, 114 S.Ct. at 1500.[24]

■ Under *Landgraf*, the first test in determining if a statute is retroactive is whether the text of the statute manifests an intent that it should be applied to cases in existence at the time of enactment and if Congress has expressly prescribed its proper reach. *Id.* at ——, ——, 114 S.Ct. at 1492, 1505. The Amendment fails the first test because the minor modifications in 28 U.S.C. § 1930(a)(6) provide no guidance as to what cases the fees should apply.[25] Having concluded that the Amendment fails the first test, *Landgraf* instructs this Court to determine if the Amendment attaches new legal consequences to events completed before its enactment and whether the Amendment would impair rights a party possessed when he or she acted, increased a party's liability for past conduct or imposed new duties with respect to transactions already completed. *Id.* at ——, ——, 114 S.Ct. at 1499, 1505.

It is an elementary precept of bankruptcy law that a confirmed Chapter 11 plan fixes the property rights of the parties and binds the debtor, creditors and any entity acquiring property under the plan. 11 U.S.C. § 1141(a); *Paul v. Monts*, 906 F.2d 1468, 1471 (10th Cir.1990) (general rule is that a confirmed plan of reorganization is binding on the debtor and other proponents of the plan, and also binds creditors and other parties in interest even if such entities have not accepted the plan). In this liquidating *Plan*, all assets of the Reorganized Debtors have been allocated to creditors. Although distri-

24. The Supreme Court also distinguishes retroactive statutes that are merely procedural, regulating secondary rather than primary conduct. *Id.* at ——, 114 S.Ct. at 1502. The Amendment is not merely procedural because it requires the Reorganized Debtors to take funds which have been allocated to creditors under the confirmed *Plan* and instead pay them to the UST.

25. Those courts that have reviewed the Amendment are split over whether the Amendment was clearly intended by Congress to be applied retroactively. *See In re Foxcroft Square Co.*, 198 B.R. 99, 104–06 (Bankr.E.D.Penn.1996) (finding the legislative history describes the proper reach of the statute, thus a de mininis fee causing but a

small reduction in anticipated distributions is not a taking and does not have a retroactive effect); *In re Precision Autocraft*, 197 B.R. 901, 908 (Bankr.W.D.Wash.1996) (amendment, as applied, has retroactive effect); *In re Upton Printing*, 197 B.R. 616, 618–20 (Bankr.E.D.La.1996) (finding the language supports the congressional intent to apply the amended statute to all Chapter 11 cases with confirmed plans pending at the time of enactment and concluding that the statute does not appear to be retroactive); *In re Central Florida Electric, Inc.*, 197 B.R. 380, 381–82 (Bankr.M.D.Fla.1996) (congressional intent clear so that statute is not retroactive, but if it is, the application is not constitutionally infirm).

bution under the *Plan* has not been completed, impaired creditors have vested rights in the proceeds of the liquidation of the Debtors' assets held pending completion of claims litigation.

If the Reorganized Debtors' are required to pay quarterly fees, previously allocated assets will not be paid to creditors as required by the *Plan*. This would likely result in a default under the *Plan*, creating an additional legal consequence to the parties' fixed rights, not contemplated before the Amendment's enactment. If this Court requires the Reorganized Debtors to breach the *Plan* by paying quarterly fees, it will also impose new duties upon the Reorganized Debtors regarding the substantially consummated *Plan*. How shall the Reorganized Debtors determine which creditors will not receive up to $100,000 in funds promised by the *Plan?* Should the Reorganized Debtors require Class 1, the VEBA created to ensure retirees health insurance coverage, to disgorge a portion of the distribution previously paid to it or to receive a reduced distribution in the future? Should the Class 11 convenience trade claims disgorge a portion of the funds earmarked for and paid to them? Or should the PBGC appeal funds or the litigation funds be charged with the fee?

Inevitably, what apparently has and will happen, is that the Reorganized Debtors will allocate to Class 12 the brunt of the fee, because that is the class for which disbursement has not yet occurred and the class in which the exact dollar amount is not fixed. But why should general unsecured creditors bear the entire impact of uncontemplated UST's fees assessed post-confirmation? Requiring the Reorganized Debtors to allocate the burden of this new fee among creditors with fixed contract claims highlights the impossibility of extracting the quarterly fee in derogation of the property and contract rights fixed by the *Plan*. As advocated by

the UST, the Amendment acts to impair the established property rights of creditors, will create liability on the part of the Reorganized Debtors for diverting assets previously allocated to creditors to the UST, and imposes new duties upon the Reorganized Debtors not allowed nor provided for in the *Plan*.

The UST, relying upon *McAndrews v. Fleet Bank of Mass.*, 989 F.2d 13 (1st Cir. 1993), asserts that the Amendment is not retroactive because plan confirmation is merely an antecedent fact. In *McAndrews*, the First Circuit concluded that enforcing a lease despite a termination-upon-insolvency clause, as allowed in the Financial Institutions Reform, Recover, and Enforcement Act of 1989 (FIRREA), was prospective and not retroactive.[26] In determining that FIRREA acted only prospectively, the court stated that a statute does not operate retroactively simply because its application requires some reference to antecedent facts and that so long as the new law determines status solely for the purpose of future matters, its application is deemed prospective. *Id.* at 16. As applied to the facts of *McAndrews*, the court found that the signing of a lease containing the termination-upon-insolvency clause did not trigger the effect of FIRREA. Only the tenant's insolvency, the FDIC's appointment as receiver, and the landlord's attempt to enforce the clause that all occurred after FIRREA's effective date triggered the statute.

From this ruling in *McAndrews*, the UST asserts the Amendment acts only prospectively because plan confirmation itself does not trigger the requirement to pay the fee, only being an open case does. This Court concludes that, as the Amendment interacts with the facts of these cases, confirmation of the *Plan* is the operative event that triggers payment of the fees. Unlike *McAndrews* which dealt with an ongoing lease, in these cases the Reorganized Debtors' and credi-

---

**26.** The applicable provisions of FIRREA allowed the Federal Deposit Insurance Corporation (FDIC) as receiver, to enforce contracts previously entered into by failed banks notwithstanding contractual provisions that allowed the lessor to abrogate the lease if any regulatory authority, such as the FDIC, took over the tenant bank. Seventeen months after the enactment of FIRREA, the tenant bank failed and the FDIC took over and assigned the leasehold interest to a new bank.

tors' rights were fixed by confirmation of the *Plan* that predated the effective date of the Amendment.

This Court recognizes that three of the cases that have dealt with the impact of the Amendment have found no retroactive effect, but they have not analyzed the Amendment in the context of a liquidation plan. In *In re Central Florida Electric, Inc.*, the court only reviewed the legislative history and did not reach the portion of *Landgraf* that requires consideration of the Amendment's retroactive effect. 197 B.R. at 381. In *In re Upton Printing*, the court found that the new fees apply only for the period after the effective date of the statute, and therefore did not attach legal consequences to the impact of the fees on events completed before its enactment. 197 B.R. at 620. In *In re Foxcroft Square Co.*, the court distinguished between statutes that do not place contractual or property rights so strongly in issue, but were statutes that altered the legal consequences of prior conduct. 198 B.R. at 104. Apparently viewing the Amendment as a part of the latter category, the court in *Foxcroft Square* viewed the consequences of paying additional fees only in relation to a liquidating debtor who would not move aggressively to close its case, and that seemed "far too anxious to litigate ... post-confirmation differences" in bankruptcy court. *Id.* at 105. However, one court, in noting that the UST's position was "pregnant with flaws and [could not] be conceptually reconciled with the overall statutory scheme of Chapter 11 ...", focused on the difficulty of applying the Amendment to a confirmed plan that provided for a total liquidation of all assets where there was no surviving debtor, and where there were no funds from which the fees could be paid. *In re C n' B of Florida*, 198 B.R. at 838.

Based on the foregoing discussion, this Court finds that not only is the Amendment retroactive as applied in these cases because it significantly affects vested property rights, it also cannot be applied retroactively because it imposes on the Reorganized Debtors duties regarding transactions already concluded that directly conflict with the contractual provisions of the *Plan*. To order the Reorganized Debtors to pay the fees would be to order them to violate the *Confirmation Order*.

### Congressional Intent

This Court's reading of the legislative history, required once the Amendment is determined to be retroactive, does not reflect an unambiguous statement of the reach of the statute, nor does it reflect that Congress expressly considered the potential unfairness of retroactive application of the statute. As stated in *Landgraf*:

> Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

*Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1501.

The UST asserts the legislative history supports the application of the fees to cases for which confirmation orders had been entered prior to January 26, 1996. As in *In re Precision Autocraft, Inc.*, 197 B.R. 901 (Bankr.W.D.Wash.1996), this Court does not find the legislative history particularly helpful. The language under the portion of the legislative history related to the Department of Justice only restates that the fees will apply to both pending and new cases and says nothing dispositive regarding whether a pending case *with a confirmed plan as of the effective date* is covered by the Amendment. *Id.* at 905. The provision under the caption related to the United States Trustee System Fund that states that the fees will apply to all pending Chapter 11 cases with confirmed reorganization plans is likewise ambiguous. As *Precision Autocraft* indicates, the language is simply a restatement of the statute and adds nothing. *Id.* What is needed but

lacking, is a statement that the fees will apply to all pending Chapter 11 cases with confirmed plans on the effective date of the Amendment. That is, the language of the legislative history clearly states that the Amendment applies to all pending cases, but can be read either to refer to a case with a confirmed plan that is pending on the date of enactment, or to a pending case in which a plan is subsequently confirmed.

The intent is therefore unclear under the standards enunciated in *Landgraf*, and as proved by the split among the few courts that have had an opportunity to review the history. Compare e.g., *In re Central Florida Electric, Inc.*, 197 B.R. at 381 ("Congress has prescribed the reach of the Amended Statute to include all Chapter 11 cases including all cases with or without confirmed Chapter 11 reorganization plans"); *In re Foxcroft Square Co.*, 198 B.R. at 103 ("legislative history supports a congressional intent to collect post-confirmation quarterly fees from all debtors falling due after the effective date of the Law, irrespective of when their case was filed or their plan was confirmed") *with In re C n' B of Florida*, 198 B.R. at 840 (clear, plain language of the Amendment "requires payment of quarterly fees only in aborted Chapter 11 cases, when the case is either dismissed or converted, and does not apply in successful and substantially consummated Chapter 11 cases, even though the Final Decree is not entered until later due to outstanding matters . . ."); *In re Precision Autocraft*, 197 B.R. at 908 ("neither the Act nor the legislative history to the Act clearly evidences Congress' desire that the Act be applied retroactively"). What is undisputedly absent from the legislative history is any statement indicating that Congress analyzed whether the Amendment was retroactive or the effect it may have on debtors and creditors bound by confirmed and substantially consummated plans. The only focus is on the generation of revenue.

The Amendment's plain language does not indicate that the fees apply to cases confirmed prior to the date of the enactment, and the legislative history does not give clear support that Congress had such a result. It does not indicate that Congress gave any consideration to the impact of the retroactive application of the Amendment on the fixed rights of debtors and creditors created by plans confirmed and substantially consummated prior to the date of the Amendment's enactment.

Applying the tests associated with *Landgraf* and *McAndrews*,[27] to the facts of this case, this Court concludes that the Amendment is impermissibly retroactive as applied to these cases. The Court acknowledges the need of the UST for additional funding in light of the decline in bankruptcy filings.[28] That need does not raise equitable considerations, and the UST has not asserted otherwise, sufficient to overcome the Amendment's impermissible retroactivity.

## CONCLUSION

The Amendment's post-confirmation fees do not apply in these cases that have been neither converted nor dismissed, and that have a substantially consummated liquidating *Plan* that allocated all estate property to creditors prior to the effective date of the Amendment. Neither the plain language of the Amendment nor the legislative history allows a contrary interpretation that would have the effect of modifying key provisions of Title 11. If this Court were to adopt the UST's reading of the Amendment, collection of the fees in these cases would still be prohibited because the Amendment is impermissibly retroactive. Since no overriding equitable considerations justify a contrary rul-

---

**27.** As did the parties in *McAndrews* in determining the reach of FIRREA, the parties in these cases have argued whether applying the Amendment violates the Fifth Amendment and constitutes an unconstitutional taking without compensation. Since this Court concludes that the plain language of the Amendment makes collection of the fees inapplicable to these cases, and that in any event the Amendment is improperly retroactive, it is unnecessary to reach the takings issue.

**28.** H.R.Rep. No. 104–196, 104th Cong., 1st Sess. at 16–17 (1995) (discussing the decline in bankruptcy filings in 1996 and the anticipated significant drop in chapter 11 filing fees which partially finance the UST program).

ing, this Court concludes the fees cannot be assessed and collected in these cases.[29]

29. The Motion seeks an order returning the funds paid to the UST. Neither party addressed either the substantive or procedural aspects of the Court issuing such an order. While UST may have waived any defenses it has under 11 U.S.C. § 106, *In re Aer–Aerotron, Inc.*, 181 B.R. 268, 271 (Bankr.E.D.N.C.1995) (discussing waiver of sovereign immunity under 1994 amendments to 11 U.S.C. § 106), this Court's power to issue an order requiring the UST to return the fees must be exercised in accordance with the procedural requirements of the Fed.R.Bankr.P. 7001. The Reorganized Debtors have not explained why this Court should overlook the ruling in *In re Riding,* 44 B.R. 846 (Bankr.D.Utah 1984) that established the practice in this Court that prohibits such orders in contested matters. The parties may elect to proceed under Fed.R.Bankr.P. 7001, Fed.R.Bankr.P. 8001 or 8003.