**In re BURK DEVELOPMENT COMPANY, INC.**

**In re Jack BURK and Martha Burk, Debtors.**

**Bankruptcy Nos. 89–11577, 89–11578.**

United States Bankruptcy Court, M.D. Louisiana.

Feb. 20, 1997.

Edna A. Latchem, Baton Rouge, LA, for Burk Development Company, Inc.

Martin A. Schott, Baton Rouge, LA, for Jack and Martha Burk.

Carolyn S. Cole, New Orleans, LA, for U.S. Trustee.

## OPINION

LOUIS M. PHILLIPS, Bankruptcy Judge.

On December 6, 1989, Burk Development Company, Inc. and Jack and Martha Burk (collectively, "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Court consolidated these cases for administrative purposes. On September 21, 1990, the Court entered an order confirming the Third Amended Plan of Reorganization ("Plan"), filed jointly by the Debtors, which Plan provided for the liquidation of the Debtors' property.

On April 3, 1996, the Debtors filed a Motion for Entry of Final Decree with this Court, alleging that the Plan had been implemented and completed, and that all property had been sold and all proceeds had been paid to the holders of valid security interests. To this motion the United States Trustee ("U.S. Trustee") objected, asserting that the Debtors owed postconfirmation quarterly fees from January 27, 1996, in accordance with 28 U.S.C. section 1930(a)(6), as amended by section 211 of the Balanced Budget Downpayment Act, I, Pub.L. No. 104–99, 110 Stat. 26, 37–38 (1996) (the "Amendment"), and that entering a final decree would be improper, without the obligation to pay fees being recognized, and the fees due being paid.

At hearing on the Debtors' Motion for Entry of Final Decree, the Court issued an oral ruling granting the Debtors' Motion for Entry of Final Decree, holding that the Debtors were not required to pay postconfirmation quarterly fees (from January 27, 1996, forward, or otherwise). Since this Court's oral ruling, there have been a number of published decisions on this issue.[1]

---

1. The Fifth Circuit has not yet ruled on this issue, and the few lower courts that have ruled have evidenced a split of opinion. A bare majority of these courts have held that the Amendment does not apply to Chapter 11 cases with plans confirmed prior to January 27, 1996. *See, e.g., In re Beechknoll Nursing Homes, Inc.,* 202 B.R. 260 (Bankr.S.D.Ohio 1996); *In re Jr. Food Mart of Arkansas,* 201 B.R. 522 (Bankr.E.D.Ark.1996); *In re CF & I Fabricators of Utah, Inc.,* 199 B.R. 986 (Bankr.D.Utah 1996); *In re Hudson Oil Company, Inc.,* 200 B.R. 52 (Bankr.D.Kan.1996);

Upon reflection, and concluding that its oral reasons were, to be blunt, somewhat sketchy, the Court offers this Opinion as supplement for, or in supercedence of, its oral ruling.

This court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and 157(a). Pursuant to 28 U.S.C. § 157(b)(2)(A), this is a proceeding over which the court has authority to issue a final order.

### Reasons for Ruling

#### I. The Plain Meaning of the Amendment.

■ On January 26, 1996, in an attempt to assist in balancing the federal budget, Congress passed the Balanced Budget Downpayment Act, I, Pub.L. No. 104–99, 110 Stat. 26, 37–38 (1996), which, *inter alia*, amended 28 U.S.C. section 1930 to provide that the U.S. Trustee could collect quarterly fees in a Chapter 11 case until conversion or dismissal of the case. Section 1930(a)(6), which became effective on January 27, 1996,[2] and which was effective on May 23, 1996, when the Court entered a final decree in this case, provided as follows:

Section 1930. Bankruptcy Fees.

(a) Notwithstanding section 1915 of this title, the parties commencing a case under title 11 shall pay to the clerk of the district court or the clerk of the bankruptcy court . . . the following filing fees:

\*    \*    \*    \*    \*    \*

(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) *until the case is converted or dismissed, whichever occurs first.* The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,-000 or more but less than $3,000,000; $5,000 for each quarter in which disbursements total $3,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.

28 U.S.C. section 1930(a)(6) (emphasis added).[3]

Prior to the Amendment, section 1930(a)(6) provided, in pertinent part, as follows:

In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) *until a plan is confirmed or* the case is converted or dismissed, whichever occurs first.

28 U.S.C. section 1930(a)(6) (emphasis added).

---

*In re C n' B of Florida*, 198 B.R. 836 (Bankr. M.D.Fla.1996); *In re Precision Autocraft, Inc.*, 197 B.R. 901 (Bankr.W.D.Wash.1996). Other courts have held that the Amendment does apply to such cases. *See, e.g. In re McLean Square Associates, G.P.*, 201 B.R. 436 (Bankr.E.D.Va. 1996); *In re SeaEscape Cruises, Ltd.*, 201 B.R. 321 (Bankr.S.D.Fla.1996); *In re Foxcroft Square Company*, 198 B.R. 99 (Bankr.E.D.Pa.1996); *Matter of Upton Printing*, 197 B.R. 616 (Bankr. E.D.La.1996); *In re Central Florida Electric*, 197 B.R. 380 (Bankr.M.D.Fla.1996).

**2.** In section 109(d) of the Omnibus Appropriations Act of 1997 (the "Omnibus Act"), passed by Congress and signed into law by the President on September 30, 1996, Congress specified that the Amendment is effective as of January 27, 1996. *See* Pub.L. 104–208, section 109(d), 110 Stat.

3009 (Sept. 30, 1996). Strangely, the Amendment itself contains no language specifying the date upon which it is effective.

**3.** In section 109(a) of the Omnibus Act, Congress added five *more* steps to the quarterly-fee sliding scale found in the Amendment. Furthermore, the fee amounts were increased for many levels of distributions. *See* Pub.L. 104–208, section 109(a), 110 Stat. 3009 (Sept. 30, 1996). Because the new sliding scale (as evidenced in the Omnibus Act) was not in effect as of the entry of the Final Decree in these cases, the Court applies the Amendment as it read on that date, rather than the Amendment as it would read today. The reason is simple. The Final Decree has been issued and the cases ordered closed. Therefore, there is no case in which to apply the new version of the Amendment.

Clearly, the deletion of the phrase "until a plan is confirmed or" in the Amendment means something. But what? Pursuant to the Amendment, the obligation of the "parties commencing a case under title 11" to pay quarterly fees no longer terminates upon confirmation of a plan. However, does this observation answer the question of what exactly the Amendment means? Given the divergence of opinions, maybe not.[4] The Court therefore turns to the plain language rule, as set forth by Justice Scalia in *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), in an effort to ferret out the true meaning of the Amendment. *See also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (SOUTER, J., dissenting) ("[Absent any] indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it.").[5] According to the plain language rule, the task of resolving a dispute regarding the meaning of a statute begins with the language of the statute itself, and where the statute's language is plain, the inquiry should end there, for the function of the courts is to enforce a statute according to its terms. *Ron Pair*, 489 U.S. at 241, 109 S.Ct. at 1030, 103 L.Ed.2d at 298.

**4.** The cases interpreting the Amendment are dealt with throughout this opinion (*infra*, the Court believes). It is sufficient to say at this point that the statute is interpreted variously by the courts that have dealt with it (even contradictorily). Notwithstanding the disagreement among courts which have looked at the Amendment, this Court does not, because of the disagreement, conclude out of the chute that the Amendment is ambiguous. In fact, the Court thinks it has figured out what the Amendment means, though the Court's approach to analyzing the language of the Amendment seems not to have surfaced in any other opinion of which the Court is aware.

**5.** On the primacy of the plain meaning rule within the ambit of federal statutory construction, *see generally, U.S. v. American Trucking Associations*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, 1350–51 (1940); *Sutton v. United States*, 819 F.2d 1289, 1292 (5th Cir.1987); *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472

Prior to the Amendment, section 1930(a)(6) of Title 28 could easily be understood. Quarterly fees in a Chapter 11 case could be terminated by one of three triggering events: confirmation of a plan, conversion, or dismissal. The U.S. Trustee's reading of the Amendment is that plan confirmation as a triggering event has been supplanted by a new triggering event, namely, the issuance of a final decree and the closing of the case. By deleting the Order of Confirmation event, without an apparent, express replacement, Congress has constructed, at first glance, the incongruence of limiting the previous number of triggering events to two, while at the same time expanding the universe of triggering events to three—the issuance of the final decree and order closing the case being the *new* third event.

The problem with the Amendment is inherent in this incongruity. Common sense (and judicial experience) tells us that if a judge knows what she is doing, the vast majority of confirmed Chapter 11 cases will be closed, as opposed to being dismissed or converted. Those judges who truly know what they are doing will effectuate case closing close on the heels on confirmation and substantial consummation of the plan,[6]

(1984); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). On the plain meaning rule with regard to Bankruptcy Code interpretation, *see Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (party seeking to defeat the plain meaning of the Bankruptcy Code bears an "exceptionally heavy burden"); *Union Bank v. Wolas*, 502 U.S. 151, 154–60, 112 S.Ct. 527, 529–33, 116 L.Ed.2d 514 (1991).

**6.** *See* the definition of "substantial consummation," as set forth in section 1101(2) of the Code:
In this chapter—
\* \* \* \* \* \*
(2) 'substantial consummation' means—
(A) transfer of all or substantially all of the property proposed by the plan to be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
(C) commencement of distribution under the plan.
11 U.S.C. section 1101(2).

though some period of time, of course, is always necessary between confirmation and closing. Therefore, though provided for within Chapter 11,[7] dismissal or conversion usually remain holstered tools in the bankruptcy court arsenal, once a plan has been confirmed.

The consequence of this practical incongruity is a linguistic and legal one. If fees are payable until a case is dismissed or converted, whichever occurs first, what if the case is never dismissed or converted? In answer to this question, the Court points to the three possible meanings to the Amendment: *Meaning Number 1:* fees are *not* payable *unless* a case is dismissed or converted;[8] *Meaning Number 2:* fees are payable *forever, unless* a case is dismissed or converted;[9] and *Meaning Number 3:* fees are payable *until* a case is dismissed, converted, or

---

7. *See* 11 U.S.C. section 1112, which provides in pertinent part:

**11 U.S.C. section 1112. Conversion or dismissal**

(a) The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—

    (1) the debtor is not a debtor in possession;

    (2) the case was originally commenced as an involuntary case under this chapter;

    (3) the case was converted to a case under this chapter other than on the debtor's request.

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

    (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

    (2) inability to effectuate a plan;

    (3) unreasonable delay by the debtor that is prejudicial to creditors;

    (4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

    (5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;

    (6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

    (7) inability to effectuate substantial consummation of a confirmed plan;

    (8) material default by the debtor with respect to a confirmed plan;

    (9) termination of a plan by reason of the occurrence of a condition specified in the plan; or

    (10) nonpayment of any fees or charges required under chapter 123 of title 28 [28 U.S.C. sections 1911 et seq.].

     \*     \*     \*     \*     \*     \*

(d) The court may convert a case under this chapter to a case under chapter 12 or 13 of this title only if—

    (1) the debtor requests such conversion;

    (2) the debtor has not been discharged under section 1141(d) of this title; and

    (3) if the debtor requests conversion to chapter 12 of this title, such conversion is equitable.

     \*     \*     \*     \*     \*     \*

(f) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter. 11 U.S.C. section 1112.

8. *See, e.g., C n' B of Florida, Inc.,* 198 B.R. at 838 ("This Court ... expressly rejects the Trustee's proposition that the quarterly fee must be paid as long as the case is pending, because the provision of the Amendment that the fees are payable until the Chapter 11 case is dismissed or converted is equally supportive of the interpretation that Congress intended the fees to be paid *in an aborted Chapter 11 case where the Debtor was unable to consummate a confirmed plan and the confirmed Chapter 11 is either dismissed or converted pursuant to section 1112(b)(6), (7), (8), or (10).*") (emphasis added); *In re CF & I Fabricators of Utah, Inc.,* 199 B.R. at 993 ("[T]he plain language of the statute indicates that Congress did *not* provide for the payment of fees in confirmed cases that are *not* converted or dismissed."); and *In re Boone,* 201 B.R. at 501 ( [F]ollowing the plain meaning of the amended statute, the U.S. Trustee is *not* entitled to post-confirmation quarterly fees in these cases or any other chapter 11 cases, pending or otherwise, *which are not converted or dismissed.*").

9. *See, e.g., In re Jr. Food Mart of Arkansas, Inc.,* 201 B.R. at 524 n. 1 ("[S]ince the statute imposes a fee, payment of which ceases only upon dismissal or conversion, the plain language of the statute arguably could require a successfully reorganized debtor to pay the quarterly fee to the U.S. Trustee in perpetuity.") and *Beechknoll Nursing Homes, Inc.,* 202 B.R. at 261 ("[T]he amended statute is nonsensical because it requires the payment of quarterly fees until the end of time.").

closed, whichever comes first.[10] To set up the following discussion, we will examine the three possible answers in more detail.

*Meaning Number 1* (fees are *not* payable *unless* a case is dismissed or converted). This clearly cannot be the meaning of the Amendment. If fees are not payable *unless* a case is dismissed or converted—or put another way, fees *are* payable *only* in cases that result in dismissal or conversion—then, either: (i) no fees are calculable until the debtor's prospects of reorganization have evaporated, that is, at the point of dismissal or conversion, or, (ii) the fees are payable up front in all cases, and if the case is neither converted nor dismissed, then the U.S. Trustee has to reimburse the debtor the money paid in fees. There are immediately apparent problems with either approach, which are not addressed by those Courts interpreting the Amendment as having *Meaning Number 1.* It is, frankly, ridiculous to conclude that Congress, within an Act entitled "Balanced Budget Downpayment Act," provided that fees previously payable in all Chapter 11 cases would not be owed, or even calculable, until the Court has determined to dismiss or convert the case, i.e., that there are no prospects of reorganization (and, therefore, in all probability, no prospects of payment of the just-calculated and owing fees).

The extent of implausibility of this interpretation is inherent in the following scenario:

> The debtor or a creditor moves to dismiss or convert the Chapter 11 case. The court holds a hearing and at the hearing decides that dismissal or conversion (it matters not for our purposes) is appropriate. The court also calculates the fees due the U.S. Trustee, and conditions dismissal or conversion upon payment of the fees due. The debtor cannot pay; the debtor cannot find a creditor who will pay; and certainly

the Judge won't pay. The Judge then decrees that the case cannot be dismissed *or* converted, and that it must remain in Chapter 11, so that the Debtor will not owe the fees that it cannot pay.

Oh, there may be answers to the foregoing, such as, "Well, the court could just go ahead and dismiss or convert without the fees being paid; so there!" While this retort might resolve the particular problem, it merely places the proponent in the position of concluding it reasonable for a court to determine that the triggering event (of dismissal or conversion) should come to pass but no bullet should be shot from the pulling of the trigger. In short, this Court cannot buy that Congress intended the U.S. Trustee to be precluded from assessing Chapter 11 debtors for fees designed to assist in the self-funding of the U.S. Trustee program, *unless and until* the case is converted or dismissed and the debtor obtains the status of being unable, in all likelihood, to pay such fees. Further (and in the event dismissal or conversion would be appropriate without payment of fees made due by the order of conversion or dismissal), this Court is unpersuaded that Congress intended that bankruptcy courts should create the triggering event (of dismissal or conversion), only to be able to send the debtor out of the bankruptcy realm into the "real world" in which the U.S. Trustee could institute a civil action—maybe even in state court—seeking collection of the fees due, and after obtaining a judgment could initiate enforcement procedures, etc., etc., against a former debtor, who has, under the federal law, come to owe the fees because it has become a candidate for the trash heap.

Simply put, it is unreasonable to conclude that the first possible mechanism for implementation of *Meaning Number 1* (no fees are calculable until the case is dismissed or converted) was intended by Congress (as a way to raise money).

---

10. *See In re Jr. Food Mart of Arkansas, Inc.,* 201 B.R. at 524 n. 1 ("Inasmuch as the plain language of this statute reaches an absurd result, a logical construction would require payment of the U.S. Trustee's quarterly fees until conversion, dismissal, or until entry of the Final Decree."). *See also In re Beechknoll Nursing Homes, Inc.,* 202 B.R. at 261 ("That Congress was laboring under a misconception when it enacted this amendment is evident.... [T]he majority of cases with confirmed plans are not dismissed (or converted). Accordingly, there must be one or another benchmark which may be used to terminate a 'successful' debtor's duty to pay quarterly fees.").

What about the debtor paying quarterly fees in *all* cases, only to have the U.S. Trustee obligated to reimburse those parties who successfully emerge through confirmed plans and orders closing cases after the final decrees? This prospect is equally ridiculous. It cannot be that Congress through this Amendment intended to establish the U.S. Trustee as a collection and refund agent, so as to provide to the successfully-reorganized Chapter 11 debtor, *from* the U.S. Treasury, a cash prize for successfully completing a Chapter 11 case. Though the government is sometimes referred to as "Uncle Sam," it boggles this Court's power of imagination to conceive of Congress acting as paternalistically as providing successful Chapter 11 debtors with a first step out of the bankruptcy door "nest egg" from the federal treasury. Certainly, the U.S. Trustee's obligation to repay postconfirmation quarterly fees to the successfully-reorganized debtor could have somehow found its way into the language of the statute, if this second possible mechanism for implementing *Meaning Number 1* (fees are payable up front in all cases, but refundable if the case is not dismissed or converted to: (i) the successful Chapter 11 reorganized debtor; (ii) the entity succeeding the reorganized debtor; (iii) the pre-reorganization debtor if the succeeding entity is different from the debtor but has not absorbed or supplanted the original debtor; or (iv) to whom?) were the statute's intention.

*Meaning Number 2* (fees are payable *forever, unless* a case is dismissed or converted). Without the Order of Conversion or Order of Dismissal in the equation regarding the payment of quarterly fees, the Amendment could be read to mean that there is no apparent limitation upon the quarterly fee time line until it is interrupted by dismissal or conversion. But this cannot be the statute's intent. While such a state of affairs produces a more revenue-raising-friendly atmosphere (among the successful cases), it might be rationally argued that fees to the U.S. Trustee, payable forever, is a bit of an objectionable intrusion. After all, the United States District and Bankruptcy Courts can

exercise jurisdiction in closed bankruptcy cases only after the case is reopened (if a case is closed, there is no "case"). Notwithstanding this, the courts espousing *Meaning Number 2* have suggested that the Amendment could rationally be read to provide the irrational consequence of "U.S. Trustee foot on debtor's throat forever," even when the debtor (no longer a debtor) must answer not at all to the court from which this laudable status (as debtor) emanated. Under this reading, the U.S. Trustee as feudal lord over all fiefdoms who have passed successfully thorough reorganization seems, to say the least, a bit much—so much so that the U.S. Trustee for this Region has not offered itself to this Court as having the exalted status of feudal lord. The real statutory analysis of why *Meaning Number 2* does not work, however, is found balled up in the analysis, set forth below, of why *Meaning Number 3* does.

What about *Meaning Number 3* (fees are payable *until* a case is dismissed, converted, *or a final decree is issued and the case is closed,* whichever comes first)? Wouldn't this work? The Court thinks it might, but for reasons differing from those offered by the U.S. Trustee and by the courts that have agreed with the U.S. Trustee's reasoning,[11] all of which conclude that *Meaning Number 2* is the plain meaning of the actual language and that such a meaning creates an absurdity, so that the statute needs to be fixed through judicial interpretation that affords a rational construct.

The Court will first explore the U.S. Trustee's reasoning before the Court offers its own interpretation. The U.S. Trustee argues that the only rational interpretation of the Amendment would be to insert "until a final decree is issued and the case is closed" as the triggering event for terminating postconfirmation quarterly fees, because otherwise the fees would accrue into perpetuity. This interpretation might suffice, if those courts interpreting the statute didn't mind indulging (if no one were looking) in a bit of statutory amendment (i.e. by adding "until a

---

11. *See, e.g., In re Jr. Food Mart of Arkansas, Inc.,* 201 B.R. at 524 n. 1; *In re Beechknoll Nursing*     *Homes, Inc.,* 202 B.R. at 261.

case is closed") to fit *ex post facto* expectations. However, whether there appears to be anyone looking or not, a judge writing statutes clearly is a problem. Let's see how this re-writing of the statute would go: Congress deletes "order of confirmation" as a triggering event for quarterly fees to terminate, but, notwithstanding that orders closing cases have been around for a long time, somehow didn't see fit to supplant "Order of Confirmation" with "Order Closing Case," or "until a final decree is issued and the case is closed,"[12] so the Court will sneak this language in when no one is looking. The Court thinks not.

Instead, the Court finds elucidation from a plain meaning analysis and arrives at *Meaning Number 3* by adhering to the Supreme Court's admonition in *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Rather than focusing upon the phrase "until a case is converted or dismissed, whichever occurs first," which is the phrase upon which the U.S. Trustee and those courts agreeing with the U.S. Trustee[13] focus, the Court instead focuses upon the introductory phrase "a quarterly fee shall be paid to the United States Trustee, for deposit in the Treasury, in each *case* under chapter 11 of title 11 for each quarter ..." (emphasis added). The Amendment plainly states that the requirement of the fee being paid is that it be paid "in each *case* under chapter 11 of title 11...." The logical inference from the word "case" is that the fee be paid in a *pending* case, that is, "in each *case [pending]* under chapter 11 of title 11...." (Simply put, there is no *case* in which a postconfirmation quarterly fee can be paid unless the case is *pending* ). Once a final decree is issued and the "case" is closed, there is no longer a "case" in which a fee can be paid—so the triggering event for terminating postconfirmation quarterly fees, if a case is not dismissed or converted, *must* be the order closing the case, after the issuance of a final decree. Accordingly, there is no need to find that the Amendment creates an absurdity which is either to be sneered at or corrected, as some courts have done.[14] Simply put, the debtor's obligation to pay the U.S. Trustee fees *in a case,* on a quarterly fee basis, must end once the *case* is no more.

In summation, this Court disagrees (rather vehemently) with those courts which have embraced *Meaning Number 1* or *Meaning Number 2,* believing that the former have come up with a statutory interpretation analysis that much resembles a poke in the collective U.S. Trustee eye, and the latter have seen absurdity where none exists (at least they have not created their own absurdity, but have tried to fix what they conceive to be a statutory problem). This Court, upon different reasoning, agrees with the U.S. Trustee, that the Amendment sets forth the issuance of·a final decree and the closing of the case as a substitutionary triggering event for the termination of quarterly fees—that is, substituting the closing of the case for plan confirmation as a triggering terminating event. Having elucidated what the Court believes the plain meaning of the Amendment to be, the Court now goes on to determine the Amendment's *temporal* scope.

## II. The Temporal Scope of the Amendment.

As noted above, the Amendment merely deleted the phrase "until a plan is confirmed or" from 28 U.S.C. section 1930(a)(6), but this deletion has caused considerable controversy regarding the temporal scope of the Amendment. The Amendment itself provides no elucidation with regard to this issue—there simply is no provision in either the Amendment or in the Balanced Budget Downpayment Act that states the date upon which the

---

**12.** Is there evidence that Congress knew of the existence of the plethora of cases being closed? It appears so. *See, e.g.,* 11 U.S.C. sections 350, 546(a)(2), 549(d)(2), 550(f)(2), 554(c), 704(1), 727(e)(2)(B).

**13.** *See, e.g., In re Jr. Food Mart of Arkansas, Inc.,* 201 B.R. at 524 n. 1; *In re Beechknoll Nursing Homes, Inc.,* 202 B.R. at 261.

**14.** *See, e.g., C n' B of Florida, Inc.,* 198 B.R. at 838; *In re CF & I Fabricators of Utah, Inc.,* 199 B.R. at 993; *In re Boone,* 201 B.R. at 501; *In re Jr. Food Mart of Arkansas, Inc.,* 201 B.R. at 524 n. 1; and *Beechknoll Nursing Homes, Inc.,* 202 B.R. at 261.

Amendment is to be effective, particularly as to pending Chapter 11 cases that had confirmed plans prior to January 26, 1996, the date upon which the President actually signed the Amendment.

The U.S. Trustee has attempted to circumvent the retroactivity issue by arguing that it seeks to impose postconfirmation quarterly fees upon the Debtors from January 27, 1996, forward, not from the time the Debtors' plan was confirmed. In the U.S. Trustee's view, this "compromise," as it were, disposes of the retroactivity issue before the Court. The U.S. Trustee also argues that the legislative history of the Amendment supports the view that Congress intended the Amendment to apply to pending Chapter 11 cases with confirmed plans, so that even if application of the Amendment to the Debtors would be retroactive application of a statute, such is what Congress intended, and retroactive application therefore is warranted.[15]

The Debtors counter that the U.S. Trustee's interpretation of the temporal scope of the Amendment is incorrect because the Amendment says nothing about its temporal scope, and further, that even if the legislative history is dispositive of the issue, applying the Amendment to the Debtors would constitute an impermissible retroactive effect: the unanticipated imposition of postconfirmation quarterly fees, even from January 27, 1996, forward, would upset settled expectations and rearrange substantive vested rights that were cemented in the confirmed plan, itself a legal contract.[16] In effect, the reorganized Debtors have argued that the Amendment should not apply to the Debtors, but even the Amendment is read as being applicable, the Amendment still does not apply to the Debtors; because Congress did not have the authority to promulgate such a retroactive Amendment.

A. Can Congress Pass a Retroactive Statute that Upsets Substantive Vested Rights Grounded in Preexisting Contracts?

■ In short, yes. Though this Court's reasoning on the temporal scope of the Amendment is grounded in the Court's analysis and interpretation of the U.S. Supreme Court's opinion in *Landgraf v. USI Film Products,* 511 U.S. 244, 280–81, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229, 262 (1994), discussed *infra,* the Court notes that the Debtors have raised the issue of whether Congress had the *authority* to promulgate retroactive legislation, an issue which was not raised in *Landgraf.*[17]

Accordingly, because the Amendment regulates purely economic matters (in that it seeks to increase already-extant quarterly fees and impose new postconfirmation fees), the Court initially turns to *Usery v. Turner*

---

**15.** *See, e.g., In re McLean Square Associates, G.P.,* 201 B.R. at 440; *In re SeaEscape Cruises, Ltd.,* 201 B.R. at 322; *In re Foxcroft Square Company,* 198 B.R. at 102–103; *Matter of Upton Printing,* 197 B.R. at 618; *In re Central Florida Electric,* 197 B.R. at 381.

**16.** Congress apparently sought to put the retroactivity controversy to rest in section 109(d) of the Omnibus Act, which provides as follows:

Provided further, that, notwithstanding any other provision of law, the fees under 28 U.S.C. section 1930(a)(6) shall accrue and be payable *from and after January 27, 1996,* in *all* cases *(including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans.*
Pub.L. 104–208, section 109(d), 110 Stat. 3009 (Sept. 30, 1996) (emphasis added).

Because *section 109(d) of the Omnibus Act* was not passed until after the hearing on Debtor's motion for entry of final decree, the U.S. Trustee did not brandish section 109(d) as "proof" that Congress intended the Amendment

to apply to pending Chapter 11 cases with confirmed plans on January 27, 1996.

**17.** Reading the case law dealing with whether the Amendment affects pending Chapter 11 cases in which plans were confirmed prior to January 27, 1996, one can lose focus of this fact. *See, e.g., In re CF & I Fabricators of Utah, Inc.,* 199 B.R. at 991–92, 995–97. Contrary to the tone of much of the case law about the sanctity of the pre-Amendment Chapter 11 process, and the foolishness of Congress to presume to be able to upset "our" (i.e., the bankruptcy courts') apple cart—forgetting that the apple cart, if it belongs to anyone, belongs to Congress, who promulgated it—the *Landgraf* case *assumes* Congress' authority to promulgate statutes that retroactively affect, take away, reorder, or "fool with" certain vested substantive concreted-into-place rights. *See Landgraf,* 511 U.S. at 268 n. 21, 114 S.Ct. at 1498 n. 21. ("[F]or present purposes we *assume* that Congress has ample power to provide for retroactive application of section 102." (emphasis added)).

*Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), for guidance in determining whether Congress had the authority to promulgate a statute which retroactively affects vested substantive property rights (assuming, for purposes of discussion, that the Amendment does retroactively affect such rights). *Turner Elkhorn* involved the issue of whether the Due Process Clause of the Fifth Amendment [18] barred Congress, in enacting the Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, from requiring that Turner Elkhorn Mining Company (the "Mining Company"), a coal mine operator (along with twenty-one other coal mine operators), provide compensation for a *former* miner's death or disability due to pneumoconiosis arising out of the miner's employment in the Mining Company's mines, even if the former miner had terminated his employment in the mining industry before the Black Lung Benefits Act had been passed. In holding that the challenged statutory provisions did not violate the Due Process Clause, the Supreme Court, in an opinion written by Justice Marshall, set forth the following "rational legislative purpose" test for determining whether Congress can legislate retrospectively with regard to the burdens and benefits of *economic* life:

> It is by now well established that *legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.* See, e.g., *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 487–488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).... *[O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.*

> ... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.... It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively. *The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.* ... [W]e would ... hesitate to approve the retrospective imposition of liability on any theory of deterrence ... or blameworthiness.... We find, however, that the imposition of liability for the effects of disabilities bred in the past *is justified as a rational measure* to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor, the operators and the coal consumers.... *It is for Congress to choose.... We are unwilling to assess the wisdom of Congress' chosen scheme.* ... It is enough to say that the Act approaches the problem of cost spreading *rationally;* whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension.

*Turner Elkhorn,* 428 U.S. at 15–19, 96 S.Ct. at 2892–94 (emphasis added).[19]

In *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), which presented the question of whether application of the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 to employers withdrawing from pension plans during the five-month period prior to the statute's enactment violated the Due Process Clause of the Fifth Amendment, the Supreme Court, in an opinion written by Justice Brennan, reaffirmed its "rational legislative purpose" test with regard to evaluating the retrospective aspects of economic legislation.[20] Relying upon *Turner Elkhorn*

18. "No person shall be ... deprived of life, liberty, or property, without due process of law." U.S. Const., Amdt. 5.

19. The statute at issue in *Turner Elkhorn* was explicit with regard to its intended retroactive effect.

20. As in *Turner Elkhorn,* the statute in *Pension Benefit Guaranty Corp.* explicitly set forth that it was to apply retroactively.

as its "starting point," *Pension Benefit Guaranty Corp.*, 467 U.S. at 728, 104 S.Ct. at 2717, the Court held that application of the statute's withdrawal liability provisions to employers withdrawing from pension plans during the five-month period prior to the statute's enactment did not violate the Due Process Clause of the Fifth Amendment, because the retroactive provisions served a rational legislative purpose:

> *[T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively.* Provided that the retroactive application of a statute is supported by a *legitimate legislative purpose furthered by rational means,* judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.... [R]etroactive legislation does not have to meet a burden not faced by legislation that has only future effects. *[The due process] burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.* ... We are loathe to reject ... [the] common practice [of enacting retroactive statutes confined to short and limited periods] when conducting the *limited judicial review accorded economic legislation under the Fifth Amendment's Due Process Clause.*

*Pension Benefit Guaranty Corp.*, 467 U.S. at 729–31, 104 S.Ct. at 2717–18 (emphasis added).

The Supreme Court also rejected the respondent's argument that the Court should apply constitutional principles that have been developed under the Contract Clause [21] when reviewing federal legislation:

> We have never held ... that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts.... Indeed, to the extent that recent decisions of the Court have addressed the issue, we have contrasted the limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due Process Clauses.... *[The] standard [that retrospective civil legislation may offend due process if it is particularly harsh and oppressive] does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in Turner Elkhorn.* ... We conclude that ... the Act is supported by a rational legislative purpose and therefore withstands attack under the Due Process Clause of the Fifth Amendment.

*Pension Benefit Guaranty Corp.*, 467 U.S. at 733–34, 104 S.Ct. at 2719–2720 (emphasis added).[22]

■ Therefore, while the aforementioned cases expressly carve out a niche for judicial review of economically-focused statutes, that niche, says the Supreme Court, is limited to Due Process Clause review, which implicates *only* the question of whether the retroactive effect of the statute is supported by a legislative purpose furthered by rational means.[23] Certainly, a statute imposing quarterly fees to raise revenues to support the U.S. Trustee

---

21. *See* Article I, Section 10, Clause 1 of the Constitution: "No State shall ... pass any ... Law impairing the Obligation of Contracts...."

22. *See also United States v. Carlton*, 512 U.S. 26, 30–32, 114 S.Ct. 2018, 2022, 129 L.Ed.2d 22 (1994) (retroactive application of a statute affecting economic rights satisfies due process constitutional limitations as long as the legislation is justified by a rational legislative purpose; as long as this requirement is met, "judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.")

23. *In re Hudson Oil Company, Inc.*, 200 B.R. at 56, the court, citing *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d

328 (1995), mentions "an additional reason not to apply the amendment to plans confirmed before its effective date." According to the bankruptcy court in *Hudson Oil*, "[t]he Supreme Court has often indicated it will construe a statute in such a way so as to avoid a difficult constitutional question." *Hudson Oil Company*, 200 B.R. at 56. (*Citing Landgraf*, 511 U.S. at 280–83, 114 S.Ct. at 1505–06.) *Plaut* involved the constitutionality of section 27A(b) of the Securities Exchange Act of 1934, which provided for reinstatement on motion of any section 10(b) actions commenced before June 19, 1991 (the day before the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362–64, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), established a uniform limitations period for federal securities fraud actions) but dis-

program is a legitimate legislative purpose, and reimposing these fees upon cases presently pending in bankruptcy courts until such cases leave is a rational means of getting the government's hands on the money it seeks to raise by the imposition of fees.[24] Therefore, it is clear that Congress had the authority to promulgate the Amendment, and was not limited therefrom by the Contract Clause of the U.S. Constitution, which in *Pension Benefit Guaranty Corp.* is seen to be applicable to provide judicial review of statutes passed by *States* only.

As we shall see, however, the fact that Congress *can* pass retroactive legislation affecting economic rights does not answer the question of whether it did so *in this case.* So did it? The Court now attempts to answer this question.

    B.   Did Congress Pass a Statute Which, if Applicable to These Cases, *Would* Act Retroactively, and if Application Would Constitute Retroactive Application, did Congress Intend to Have it so?

■ While *Turner Elkhorn* and *Pension Benefit Guaranty Corp.* examined the issue

of whether Congress had the *authority* to enact retrospective economic legislation, the temporal scope of which legislation was not at issue in those cases, *Landgraf v. USI Film Products,* 511 U.S. 244, 280–81, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229, 262 (1994), *assumed* that Congress had the authority to provide for retroactive application of section 102 of Title VII of the Civil Rights Act of 1965 ("Title VII"), *id.,* 511 U.S. at 267 n. 21, 114 S.Ct. at 1498 n. 21, and instead attempted to decipher the *temporal scope* of that provision. In *Landgraf,* the Supreme Court held that section 102 did not apply to a Title VII case that was pending on appeal when the 1991 Civil Rights Act was enacted. In so holding, the Court *first* examined the plain meaning of the statutory provision to determine whether it plainly set forth its temporal scope:

> Our *first* question ... is whether the *statutory text* on which petitioner relies manifests an intent that the 1991 Act should be applied to cases that arose and went to trial before its enactment.... Section 402(a), the only provision of the Act that speaks directly to the question before us,

---

missed thereafter as being time barred, provided that the action would have been timely under applicable pre-*Lampf* state law. The Supreme Court, in an opinion written by Justice Scalia, held that section 27A(b) contravened the Constitution's separation of powers to the extent that the provision required federal courts to reopen final judgments entered before the provision's enactment. *See Plaut,* 514 U.S. at ——, 115 S.Ct. at 1452–53, 131 L.Ed.2d at 342.

According to the *Hudson Oil Company* court, *Plaut* "raises a serious question about the constitutionality of the Trustee's theory [that the Amendment should be applied to cases in which plans have previously been confirmed].... [T]he fact bankruptcy courts are not Article III courts may create some uncertainty about the propriety of applying *Plaut* directly to a confirmation order. Nevertheless, this Court is a 'unit' of an Article III court, 28 U.S.C.A. section 151, and jurisdiction over bankruptcy cases is referred from that Article III court to this Court, section 157(a), so *Plaut* certainly places the Trustee's theory in some doubt which can be avoided by refusing to apply the amendment to previously-confirmed plans." *Hudson Oil,* 200 B.R. at 56.

This Court thinks the "boogie person" conjured up by the *Hudson Oil* court's reference to *Plaut* as offering yet "an additional reason not to

apply the amendment" is illusory. First, the ruling in *Plaut* actually *supports* a holding that the Amendment should not be applied to pending Chapter 11 cases with confirmed plans because the statute *does not expressly state that it should.* Justice Scalia's majority opinion in *Plaut* explicitly noted that *Landgraf "confirmed"* the "traditional rule ... that statutes do not apply retroactively *unless Congress expressly states that they do."* *Plaut,* 514 U.S. at —— ——, 115 S.Ct. at 1461–62 (emphasis added). Second, if Congress passed a statute requiring payment of quarterly fees in cases with already-confirmed plans, then certainly it could impose the requirement without a concomitant requirement that this Court "reopen" its Order confirming the plan. In fact, the confirmation Order generally utilized by this Court is approximately three lines long, saying something like "For reasons assigned, the plan is confirmed and a motion for final decree shall be filed within, say, 45 days." Why Congress could not impose quarterly fees post-confirmation without the Court reopening its confirmation Order is beyond this Court.

24. *See, e.g., In re McLean Square Associates, G.P.,* 201 B.R. at 441; *In re Foxcroft Square Company,* 198 B.R. at 104–05; *In re Upton Printing,* 197 B.R. at 619–20; *In re Central Florida Electric, Inc.,* 197 B.R. at 381–82.

... does not, *by itself,* resolve the question before us. A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.

*Id.,* 511 U.S. at 257, 114 S.Ct. at 1492–93 (emphasis added).

After a discussion of the statute, the Supreme Court acknowledged that the statute's language did not evidence congressional intent to apply the statute retroactively. Next, in what this Court considers a curious endeavor, the Supreme Court meanders through the legislative history of floor statements, pronouncements, etc., while at the same time mentioning "some frankly partisan" statements and saying that they "cannot plausibly be read as reflecting general agreement." *Id.,* 511 U.S. at 262, 114 S.Ct. at 1495.[25] The Court concludes that "the history of the 1991 Act conveys the impression that legislators agreed to disagree about whether and to what extent the Act would apply to preenactment conduct." *Id.,* 511 U.S. at 263, 114 S.Ct. at 1495–96. As an introductory remark in *Landgraf* states best, "[t]he relevant legislative history of the 1991 Act *reinforces* our conclusion that sections 402(a), 109(c) and 402(b) cannot bear the weight petitioner places upon them." *Id.,* 511 U.S. at 262, 114 S.Ct. at 1495 (emphasis added).

Evidencing the leisurely nature of its stroll through the legislative history garden, the Supreme Court, finds itself, frankly, sawing off the limb it had climbed out on (unnecessarily, in this Court's view) with a spate of most curious speculation (that appears to emulate television journalistic endeavor rather than legislative history analysis):

> Although the passage of the 1990 bill [which, recall, was vetoed by the President and which contained express retroactivity provisions], *may indicate* that a majority of the 1991 Congress also favored retroactive application [now the Court is talking about the next year's Congress which passed the 1991 Act], even the will of the majority does not become law unless it follows the path charted in Article 1, section 7, clause 2 of the Constitution. *See INS v. Chadha,* 462 U.S. 919, 946–951, 103 S.Ct. 2764, 2781–2784, 77 L.Ed.2d 317 (1983).

*Landgraf,* 511 U.S. at 263, 114 S.Ct. at 1496 (emphasis added).[26]

Surely the Supreme Court's resort to what a subsequent Congress might have intended because (one supposes, but cannot be sure) some of the same people were in the 1991 Congress as were in the 1990 Congress, which passed a different version of legislation on the same subject matter that was vetoed (?), must be seen as a dalliance of no import. Otherwise, why would the Court in summation effectively undercut the entire excursion by reference to the Article, Section, and Clause of the Constitution, setting forth how

---

**25.** In his concurrence, in which Justices Kennedy and Thomas joined, Justice Scalia took issue with the majority's approach as follows:

The Court's rejection of the floor statements of certain Senators because they are 'frankly partisan' and 'cannot plausibly be read as reflecting any general agreement,' ... reads like any other exercise in the soft science of legislative historicizing [footnote omitted], undisciplined by any distinctive 'clear statement' requirement.

*Id.,* 511 U.S. at 286, 114 S.Ct. at 1522.

**26.** Article I, section 7, clause 2 of the U.S. Constitution provides as follows:

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevents its Return, in which Case it shall not be a Law.

U.S. Const., Art. I, § 7, cl. 2.

legislative will becomes translated into statute? And if that reference is not enough, this conclusive sentence by which the Court moves off its foray seems dispositive:

> In the absence of the kind of unambiguous directive found in section 15 of the 1990 bill, we must look elsewhere for guidance on whether section 102 applies to this case.

*Id.,* 511 U.S. at 263, 114 S.Ct. at 1496.

What this Court has concluded, in agreement with Justice Scalia in his concurrence in *Landgraf,* is that the mention of legislative history in *Landgraf* was purely peripheral, and at best, *dicta:* the statutory interpretation in *Landgraf* proceeds initially upon the language of the statute. The legislative history is merely seen as "reinforcing" the Supreme Court's conclusion as to the meaning of the statute. (But once a conclusion is reached, it is reached, isn't it? And even more, without a mention of ambiguity, isn't the conclusion truly the conclusion?). The process of enacting legislative will into statute (the path charted in Article I, section 7, clause 2 of the U.S. Constitution) is announced in *Landgraf* as the ·only mechanism by which the Court will give credence to the will of Congress. The unambiguous directive held up as a counterpoint to the 1991 statute, was itself a statute. The Supreme Court need not have dallied; for this Court's purpose it is as though the Supreme Court did not.

In short, the "elsewhere" to which the Supreme Court looked was *not* the legislative history of the statute, but rather, two historically-embraced canons of statutory construction:

> As Professor Llewellyn famously illustrated, many of the traditional canons have equal opposites. *See* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes are to be Construed,* 3

Vand.L.Rev. 395 (1950).... *[F]ederal courts have labored to reconcile two seemingly contradictory statements found in our decisions concerning the effect of intervening changes in the law.* Each statement is framed as a generally applicable rule for interpreting statutes that do not specify their temporal reach. The first rule is that 'a court is to apply the law in effect at the time it renders its decision,' *Bradley [v. School Bd. of City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ]. The second is the axiom that '[r]etroactivity is not favored in the law,' and its interpretive corollary that 'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.' *Bowen [v. Georgetown University Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ].... We must, therefore, focus on the apparent tension between the rules we have espoused for handling similar problems in the absence of an instruction from Congress.

*Landgraf,* 511 U.S. at 263–64, 114 S.Ct. at 1496 (emphasis added).[27]

■ In other words, the Supreme Court does not accede to the utilization of legislative history or extra-textual sources of intent as possible sources of rebuttal of the traditional presumption against retroactive legislation; only the text of a statute can displace this presumption.

The Fifth Circuit, in interpreting *Landgraf,* is in seeming agreement with this Court's perspective on *Landgraf,* for the Fifth Circuit's analyses of retroactivity have been limited to the text of the statutes at issue. Any resort by the Fifth Circuit to legislative history has had the objective of merely *reinforcing* the conclusion already

---

**27.** Nonetheless, Justice Scalia, in his concurrence, chastised the majority for expanding statutory analysis through improper resort to legislative history. *Id.,* 511 U.S. at 286, 114 S.Ct. at 1522. While Justice Scalia has a point (after all, this is the Supreme Court so why dally where dalliance is unwarranted, for to do so provides ground for the suggestion that all *can* do so), the Court thinks that in his urge to lay the hammer

down, Justice Scalia did not notice the explication by the majority of just what the second canon of statutory construction has taught—that " 'congressional enactments and administrative rules will not be construed to have retroactive effect *unless their language* requires this result.' " *Id.,* 511 U.S. at 264, 114 S.Ct. at 1496. (Emphasis added.)

reached by the court, and *not* of determining the statute's temporal scope or of displacing the traditional presumption against retroactivity. *See, e.g., Drinkard v. Johnson,* 97 F.3d 751, 765–66 (5th Cir.1996); *Mendez–Rosas v. Immigration and Naturalization Service,* 87 F.3d 672, 674 (5th Cir.1996); *St. Louis v. Texas Workers' Compensation Commission,* 65 F.3d 43, 45 (5th Cir.1995); *Rutland v. Moore,* 54 F.3d 226, 229–30 (5th Cir.1995); *Shipes v. Trinity Industries,* 31 F.3d 347, 347–48 (5th Cir.1994); *Hartford Casualty Insurance Co. v. Federal Deposit Insurance Corp.,* 21 F.3d 696, 700–701 (5th Cir.1994).

Finally, the Fifth Circuit's and this Court's interpretation of *Landgraf* comports with Justice Scalia's concurrence in *Landgraf,* in which Justice Scalia read the majority's examination of the statute's legislative history as mere *dicta:*

> I of course agree with the Court that there exists a judicial presumption, of great antiquity, that a legislative enactment affecting substantive rights does not apply retroactively *absent clear statement to the contrary.* ... The Court, however, is willing to let that clear statement be supplied, not by the text of the law in question, but by individual legislators who participated in the enactment of the · law, and even legislators in an earlier Congress which tried and failed to enact a similar law.... This effectively converts the 'clear statement' rule into a 'discernible legislative intent' rule—and event that understates the difference.... If it is a 'clear statement' we are seeking, surely it is not enough to insist that the statement can 'plausibly be read as reflecting general

agreement'; the statement must clearly reflect general agreement. *No legislative history can do that, of course, but only the text of the statute itself. That has been the meaning of the 'clear statement' retroactivity rule from the earliest times.... I do not deem that clear rule to be changed by the Court's dicta regarding legislative history in the present case.*

*Landgraf,* 511 U.S. at 286, 114 S.Ct. at 1522–23 (emphasis added).

Accordingly, in determining the temporal scope of the Amendment at hand, this Court reads *Landgraf* as according *all* determinative weight to the "unambiguous directive" of the Amendment and *no* determinative weight to the statute's legislative history; in other words, the Court begins *and ends* its analysis with the plain language of the statute.[28]

This process, however, is not as simple as it might appear at first blush to be, for inherent in the Court's analysis of the plain language of the Amendment (with the objective of determining the Amendment's temporal scope) is a necessary excursion (as noted by the Supreme Court in *Landgraf* ) into the seeming contradiction between, on the one hand, applying the law in effect at the time a court renders its decision, and on the other hand, the traditional presumption disfavoring retroactive legislation. The *Landgraf* Court closely examined this traditional presumption as follows:

> As Justice Scalia has demonstrated, *the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. See*

---

**28.** In addition to comporting with the Fifth Circuit's interpretation of *Landgraf,* and Justice Scalia's concurrence in *Landgraf,* both of which interpret *Landgraf* to stand for the proposition that in determining the temporal scope of a statute, any resort to legislative history must have the objective of merely *reinforcing* the conclusion already reached by the court and not determining the statute's temporal scope or of displacing the traditional presumption against retroactivity, this Court's interpretation of *Landgraf* comports with the Supreme Court's later reading of *Landgraf* in *Plaut,* 514 U.S. at —— ——, 115 S.Ct. at 1461–62. As noted earlier, *see supra* note 23, Justice Scalia, writing for the majority in *Plaut,*

specified that *Landgraf "confirmed"* the traditional rule ... that statutes do not apply retroactively *unless Congress expressly states that they do,"* and goes on to point out further, even, that "reliance on the vaguely remedial purpose of a statute to defeat the presumption against retroactivity was rejected in the companion cases of *Landgraf* ..." *Plaut,* 514 U.S. at —— ——, 115 S.Ct. at 1461–62 (emphasis added; citations omitted). Clearly the Supreme Court, when acting through Justice Scalia in this particular area, militates in favor of a pronounced presumption against retroactivity which is not limited by the loosely-resorted-to distinction between substance and procedure.

*Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 842–44, 855–856, 110 S.Ct. 1570, 1579–1581, 108 L.Ed.2d 842 (1990) (SCALIA, J., concurring). . . . *Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.* [Footnote omitted.] For that reason, the 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.' *Kaiser,* 494 U.S., at 855, 110 S.Ct., at 1586. . . . *In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions.* It is therefore not surprising that the antiretroactivity principle finds expression in several provisions of our Constitution [citing the Ex Post Facto Clause, the Fifth Amendment's Takings Clause, the prohibitions on "Bills of Attainder," and the Due Process Clause.] . . . These provisions demonstrate that *retroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration.* Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals. . . . The Constitution's restrictions, of course, are of limited scope. *Absent a violation of one of those specific provisions, the potential unfairness of retroactive civil legislation is not a suf-*

*ficient reason for a court to fail to give a statute its intended scope.* [Footnote omitted.] Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary. *However, a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness.*

*Landgraf,* 511 U.S. at 265–68, 114 S.Ct. at 1496–98 (emphasis added).

The *Landgraf* Court then adopts Justice Story's "influential definition" of retroactive legislation, as set forth in *Society for Propagation of the Gospel v. Wheeler,* 22 F.Cas. 756 (No. 13,156) (CCDNH 1814):

'[The ban on retrospective legislation embraces] all statutes, which, though operating only from their passage, affect vested rights and past transactions. . . . Upon principle, every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective. . . . (citing *Calder v. Bull,* 3 Dall. 386, 1 L.Ed. 648 (1798) and *Dash v. Van Kleeck,* 7 Johns. 477 (N.Y.1811)).'

*Landgraf,* 511 U.S. at 268–69, 114 S.Ct. at 1498–99 (quoting *Society for Propagation of the Gospel v. Wheeler,* 22 F.Cas. 756 (No. 13,156) (CCDNH 1814)).[29]

29. Justice Scalia disagreed with the majority's adoption of Justice Story's definition of retrospective laws, because such a focus on vested rights might suggest that the Court would hold all changes in rules of procedure, as opposed to matters of substance, to apply retroactively. *Id.,* 511 U.S. at 286, 114 S.Ct. at 1524. In Justice Scalia's view, the question instead should be as follows:

*[A]bsent clear statement to the contrary, what is the presumed temporal application of a statute? For purposes of that question, a procedural change should no more be presumed to be retroactive than a substantive one* . . . . *The critical issue . . . is not whether the rule*

*affects 'vested rights,' or governs substance or procedure, but rather what is the relevant activity that the rule regulates. Absent clear statement otherwise, only such relevant activity which occurs after the effective date of the statute is covered.* Most statutes are meant to regulate primary conduct, and hence will not be applied in trials involving conduct that occurred before their effective date. But other statutes have a different purpose and therefore a different relevant retroactivity event. . . . I do not maintain that it will always be easy to determine, from the statute's purpose, the relevant event for assessing its retroactivity. . . .

The *Landgraf* Court goes on to emphasize that the operative question in determining whether a statute operates retrospectively is *not* whether the statute is applied in a case arising from conduct antedating the statute's enactment, or whether retrospective application would upset expectations based in prior law, but rather "whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf,* 511 U.S. at 270, 114 S.Ct. at 1499. This determination of the temporal scope of a statute is a long process:

> The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.... [F]amiliar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.... *Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent.... The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.... The largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and suitability are of prime importance.*

*Id.,* 511 U.S. at 270–71, 114 S.Ct. at 1500 (emphasis added).

The Supreme Court thus establishes "prospectivity" as the appropriate default rule:

> The presumption against statutory retroactivity had special force in the era in which courts tended to view legislative interference with property and contract rights circumspectly. In this century, legislation has come to supply the dominant means of legal ordering, and circumspection has given way to greater deference to legislative judgments.... *But while the*

Ordinarily, however, the answer is clear—as it is in ... *Landgraf....*

> *constitutional impediments to retroactive civil legislation are now modest, prospectivity remains the appropriate default rule. Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.*

*Id.,* 511 U.S. at 272–73, 114 S.Ct. at 1500–01 (emphasis added).

The *Landgraf* Court notes, however, that there are many situations where a court should apply the law in effect at the time its renders its decision, even though that law was enacted after the events that gave rise to the suit:

> Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive.... We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction law when the underlying conduct occurred or when the suit was filed.... Changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity.... We [have] noted the diminished reliance interests in matters of procedure.... Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not

*Id.,* 511 U.S. at 286, 114 S.Ct. at 1524–26.

make application of the rule at trial retroactive.

*Id.,* 511 U.S. at 273–75, 114 S.Ct. at 1501–02.[30]

The Supreme Court concludes with what this Court likens to a "retroactivity road map," setting forth the specific steps a court must take in determining the temporal scope of a statute, and rejecting the notion that the presumption against retroactivity can be rebutted by the idea that retroactive application of a new statute would vindicate its purpose more fully:

> ***When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result. ...*** It will frequently be true ... that retroactive application of a new statute would vindicate its purpose more fully. [Footnote omitted.] That consideration, however, is not sufficient to rebut the presumption against retroactivity. Statutes are seldom crafted to pursue a single goal, and compromises necessary to their enactment may require adopting means other than those that would most effectively pursue the main goal.

*Id.,* 511 U.S. at 280–86, 114 S.Ct. at 1505–07 (emphasis added).[31]

Mindful of its conclusion that its job begins and ends with the words of the Amendment, as far as the first step of *Landgraf*'s "retroactivity road map" goes, the Court notes that as was the case with the statute in *Landgraf,* the Amendment lacks "unambiguous directive," *id.,* 511 U.S. at 263, 114 S.Ct. at 1496, with regard to its temporal scope: the Amendment is simply silent as to its effective date. The Court's *Landgraf* analysis, therefore, is quite simple: if the Amendment in fact would operate "retrospectively," as that term is utilized in *Landgraf,* if applied to pending cases involving plans confirmed prior to the Amendment's effective date of January 27, 1996, then the presumption against retroactive application precludes the Amendment's applicability to such cases.

■ Having determined that Congress has *not* expressly prescribed the proper reach of the Amendment in the text of the Amendment, the Court now embarks on the second step of the "retroactivity road map," as set forth in *Landgraf,* namely, determining whether the Amendment would have *retroactive effect,* i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. *Landgraf,* 511 U.S. at 280–81, 114 S.Ct. at 1505. These criteria, chosen by the Supreme Court to determine whether a new statute has retroactive *effect,* point markedly towards the notion of *vested substantive rights,* and indeed, Justice Scalia in his dissent faults the majority in *Landgraf* for couching the majority's retroactivity analysis in terms of vested rights.[32] Be that as it may, this Court, following the majority's directive in *Landgraf,* will determine the retro-

---

**30.** *See supra,* note 29.

**31.** Justice Blackmun dissented, arguing that a "straightforward textual analysis" of the 1991 Act indicated that the provision of compensatory damages, as set forth in section 102, and its attendant right to a jury trial, applied to cases pending on appeal on the date of enactment, and that the majority opinion had extended the presumption against retroactive legislation beyond its historical reach and purpose.

**32.** *See Landgraf,* 511 U.S. at 286, 114 S.Ct. at 1524–25. As mentioned, Justice Scalia does not say that the majority's focus on vested rights (substance vs. procedure) is irrelevant, but rather that the presumption against retroactive legislation extends both to substantive and to procedural legislation.

active effect of the Amendment in light of the concept of substantive vested rights, it being the clear conclusion of the majority in *Landgraf* that without such an unambiguous statutory directive, if application of a statute to a case before the Court constitutes "retrospective application," as the term is used in *Landgraf,* then the presumption against retrospective (or retroactive) legislation will preclude the statute's applicability to that case.

Before the Court can explore whether application of the Amendment (even from January 27, 1996, forward) contravenes the traditional presumption against retroactive legislation,[33] the Court first must explore the *effect* of an order of confirmation. Section 1141 of the Bankruptcy Code sets forth this effect as follows:

### 11 U.S.C. section 1141. Effect of confirmation

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a *confirmed* plan *bind* the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, *the confirmation of a plan vests all of the property of the estate in the debtor.*

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, *the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.*

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, *the confirmation of a plan—*

(A) *discharges the debtor from any debt that arose before the date of such confirmation,* and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title; or

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan; and

(B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

(2) The confirmation of a plan does not discharge an individual debtor from any debt excepted from discharge under section 523 of this title.

(3) The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

(4) The court may approve a written waiver of discharge executed by the debtor after the order for relief under this chapter.

11 U.S.C. section 1141 (emphasis added).

■ Section 1141 of the Code thus establishes that an important effect of a confirmed Chapter 11 plan is the creation of a *contract* which creates *vested substantive property rights* and that is *binding* on the debtor, on any entity issuing securities under the plan, on any entity acquiring property under the

---

**33.** That is, would application of the Amendment to the Debtors, even from January 27, 1996, forward, "impair rights a party possessed when he acted, increase a party's liability for part

conduct, or impose new duties with respect to transactions already completed"? *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505.

plan, and on any *prepetition creditor*, equity security holder, or general partner in the debtor, whether or not the claim or interest of any of these parties is impaired under the plan and whether or not any of these parties has accepted the plan. *See, e.g., Holywell Corp. v. Smith*, 503 U.S. 47, 56–59, 112 S.Ct. 1021, 1027–28, 117 L.Ed.2d 196 (1992); *Eubanks, M.D. v. Federal Deposit Insurance Corporation*, 977 F.2d 166 (5th Cir.1992); *Bank of Louisiana v. Pavlovich (In re Pavlovich)*, 952 F.2d 114 (5th Cir.1992). These vested substantive rights generate *increased* reliance interests, unlike the *"diminished* reliance interests in matters of procedure" which "regulate secondary rather than primary conduct." *Landgraf*, 511 U.S. at 275, 114 S.Ct. at 1502 (emphasis added).

Secondly, section 1141 of the Code effectuates, by operation of law, a discharge of all prepetition debt, including that debt which arises between the filing of the petition and the Order of Confirmation. Prior to the Amendment, the claim for U.S. Trustee's fees was entitled to administrative priority pursuant to section 503(b) of the Code,[34] and while failure to pay might, if raised, be grounds for denial or postponement of confirmation, if not raised, the claim for fees, like other section 503(b) administrative expenses, would be discharged.

Third, the statute in place at the time the Debtors' Plan was confirmed expressly relieved the Debtors of any postpetition obligations to the United States Trustee. It is irrelevant whether or not this case should have been closed sooner (and probably it should have, though in the old days during which this plan was confirmed, the author of this opinion possessed—well, let's be kind—an inchoate understanding of substantial con-

summation, and, as well, these Debtors' particular Plan provided for the liquidation of numerous parcels of real estate, subject to creditor and Court approval). The statute as previously confected allowed the parties in cases with confirmed plans to rely on the absence of U.S. Trustee fees while they proceeded (or meandered) toward consummation and closing. The fact of the matter is that the particular or specific facts of the matter are irrelevant. Confirmation of plans of reorganization is the crucial but *not* the last step toward the closing of the Chapter 11 case and the emergence of the reorganized butterfly from the pupae of Court oversight.[35] Regardless of the particulars of case by case circumstances, it is clear that proponents of plans had the substantive statutory right to rely on the absence of postconfirmation U.S. Trustee fees during the period of time between confirmation and closing. Therefore, plan proponents were guided by the pre-Amendment statute to confect plans upon this reliance, with regard to the paths the plans could take after confirmation.

■ In summation, the U.S. Trustee was bound as contracting party to the Debtors' Plan, and was discharged as creditor and precluded by statute from encumbering the Debtors' postconfirmation preclosing financial life. Upon all of this the Debtors could rely, and upon this reliance the Debtors' Plan was and could be structured.[36]

In light of the sanctity of the Debtors' confirmed Chapter 11 Plan and the substantive vested rights which are cemented therein, and in light of the Supreme Court's focus on substantive vested rights in its retroactivity analysis in *Landgraf*, the Court concludes that the U.S. Trustee's interpretation of the

---

**34.** *See, e.g., U.S. Trustee v. Endy (In re Endy)*, 104 F.3d 1154 (9th Cir.1997); *In re Juhl Enterprises, Inc.*, 921 F.2d 800 (8th Cir.1990); *U.S. Trustee v. Hirsh (In re Ehrman)*, 184 B.R. 362 (D.Ariz. 1995).

**35.** See, for example, section 1142 of the Code, setting forth certain postconfirmation powers of the Court to aid in consummation.

**36.** Given the fee schedule then in place, the obligations were in some cases rather extensive. Regardless of the size of the case, however, the U.S. Trustee fee line item in the monthly income and

expense statements filed with the Court during the postpetition, preconfirmation time frame, was always deleted in the pro forma statements used to establish the feasibility of plans of reorganization, and therefore constituted a fact upon which the parties before the Court, **including the U.S. Trustee**, and the Court, as well, relied in determining whether the Debtors' Plan was confirmable. It must go without argument that as of confirmation, the U.S. Trustee (prior to January 27, 1996) looked upon the absence of postconfirmation U.S. Trustee's fees as a plus, a factor militating in **favor of confirmation.**

Amendment (even conceding that postconfirmation quarterly fees would be assessed only from January 27, 1996, forward) cannot withstand scrutiny. Even a cursory glance at the Amendment reveals that the *effect* of the Amendment (and remember, under *Landgraf,* the Court is directed to examine whether the new statute has retroactive *effect* ) is to rearrange retroactively the substantive vested rights that the Debtors' confirmed plan itself created and cemented.[37] In the present case, the Debtors' Plan has been substantially consummated and in fact was substantially consummated prior to January 27, 1996 (the effective date of the Amendment), within the meaning of section 1101(2) of the Code. On the date of confirmation of the Debtors' Plan, vested rights were created which were embodied in the Plan (itself a contract). Moreover, at that time, 28 U.S.C. section 1930(a) required that the U.S. Trustee's fees be paid *until confirmation,* and established that confirmation of the Debtors' plan was the earliest triggering event to terminate the obligation to pay quarterly fees.

The Amendment therefore unquestionably imposes an *additional postconfirmation legal duty* upon the Debtors because, pursuant to the Amendment, the Debtors are now argued to be responsible for paying postconfirmation quarterly fees (albeit fees accruing from January 27, 1996, forward). As such, and in contravention of the traditional presumption against retroactivity as set forth in *Landgraf,* retroactive application of the Amendment would clearly impair the rights of the parties as cemented in the confirmed Plan (which itself is a legal and binding contract) by rearranging the allocation of funds; would increase the Debtors' liability for past conduct by imposing unexpected postconfirmation quarterly fees; and would impose new duties with respect to transactions already completed, the completed transactions being all those contained within and comprising the overall pinnacle transaction—**confirmation of a plan of reorganization.** Retroactive application of the Amendment therefore contravenes the "[e]lementary considerations of fairness ... that individuals should have an opportunity to know what the law is and to conform their conduct accordingly" and the principle that "settled expectations should not be lightly disrupted." *Landgraf,* 511 U.S. at 265, 114 S.Ct. at 1497.

The Court's conclusion that the Amendment impairs contractual rights cemented in the confirmed Plan is dispositive of the U.S. Trustee's reliance on *U.S. Trustee v. Prines (In re Prines),* 867 F.2d 478 (8th Cir.1988), as well. In *Prines,* the Eighth Circuit held that the quarterly fees set forth in the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986 could be assessed in *pending* cases *in which plans had not been confirmed* in districts participating in the U.S. Trustee's pilot program immediately upon the Act's effective date. *Prines* is substantively different from the case now before the Court because there is an inherent difference between imposing quarterly fees on a party that has filed a petition but has not yet confirmed a plan and a party that is locked into contractual obligations by virtue of a confirmed plan, proposed upon a number of financial assump-

---

**37.** *See, e.g., In re Precision Autocraft, Inc.,* in which the court concludes that the postconfirmation quarterly fee is not merely a procedural regulation:

The imposition of the UST's post-confirmation quarterly fee on a debtor with a confirmed plan has a clear substantive impact on the debtor and thus cannot be deemed merely procedural. The fee adversely affects all creditors and the debtor under the plan in the case where the plan payments have been carefully structured, in both timing and amount, to coincide with the debtor's financial performance. To achieve confirmation, a debtor must meet strict statutory criteria and must convince creditors and the UST that performance is feasible within the parameters of its projected expenses. Further, an order of confirmation must be supported by a specific finding by the Court that the projections are realistic and the payments feasible. Thus, in the most important sense, plan confirmation establishes the substantive rights of all parties bound by the plan.

*Id.,* 197 B.R. at 907. *See also In re Hudson Oil Company, Inc.,* 200 B.R. at 54 ("The intended finality of the confirmed plan would be circumvented by imposing the fees in these cases."); *In re CF & I Fabricators of Utah, Inc.,* 199 B.R. at 996 n. 24 ("The Amendment is not merely procedural because it requires the Reorganized Debtors to take funds which have been allocated to creditors under the confirmed Plan and instead pay them to the UST.").

tions, among them, no postconfirmation U.S. Trustee fees. In other words, if a debtor cannot pay quarterly fees *pre* confirmation, perhaps the debtor ought not be in Chapter 11, but it is an entirely different matter to claim that a debtor that is locked into contractual obligations by virtue of a confirmed plan of reorganization somehow must pay postconfirmation quarterly fees that were not accounted for in the plan. The *effect* of the legislation in *Prines* clearly would not contravene the traditional presumption against retroactivity, as a newly-filed bankruptcy case can hardly be said to have predicted all post-petition, pre-confirmation fees, expenses, taxes, charges, *etc.*

Applying the Amendment to cases with confirmed plans would, given the status of the remaining sections of the Bankruptcy Code, generate a clanging of dissonance. As some courts have mentioned,[38] only the plan proponent or the reorganized debtor, not the U.S. Trustee, has standing to attempt to modify a plan prior to substantial consummation, and therefore that the Amendment conflicts with section 1127(b) of the Bankruptcy Code.[39] Also, the Amendment states nothing about modification of confirmed Chapter 11 plans and thereby, according to some courts, conflicts with the express language of section 1127(b) prohibiting the modification of substantially consummated plans.

Another problem with the Amendment some courts have mentioned is[40] that, because nothing in the Amendment indicates that it was meant to alter cases with plans that complied with section 1129(a)(12) at the time they were confirmed, imposition of post-confirmation quarterly fees runs afoul of section 1129(a)(12) of the Code.[41]

Finally, the Court acknowledges that certain courts have pointed out the foibles that quarterly fees are required to be paid by a debtor-in-possession, but after the entry of the order of confirmation there is no longer a debtor-in-possession, but only a debtor; that quarterly fees are computed, on the basis of operating reports, on the disbursements made by the debtor-in-possession during the relevant period, but that operating reports are not required after confirmation and no authority exists to compel a debtor whose plan has been confirmed to file any such reports with the U.S. Trustee; and that it would be impossible to comply with the interpretation of the Amendment as urged by the U.S. Trustee, in cases where the plan calls for a total liquidation of all assets and is consummated by the distribution of all funds pursuant to the plan but, because of an appeal, the case cannot be technically closed and no final decree can be entered until the appeal is resolved.[42] Moreover, this Court notes that the Amendment is silent as to the source of the funds from which the postconfirmation quarterly fees are to be paid and does not require that the fees originate from the estate, which, upon confirmation, vests in the debtor free and clear of all claims and interests.[43]

Now, these are not imaginary concerns. The Court sees these practical problems as being worthy of mention because they provide extra bases for concluding that applying the Amendment to pending cases with con-

---

**38.** *See, e.g., CF & I Fabricators, Inc.,* 199 B.R. at 991; *In re Hudson Oil Company, Inc.,* 200 B.R. at 54; *In re Beechknoll Nursing Homes, Inc.,* 202 B.R. at 262.

**39.** Section 1127(b) of the Code provides that "[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan. . . ."

**40.** *See, e.g., In re Beechknoll Nursing Homes, Inc.,* 202 B.R. at 262–63; *In re Hudson Oil Co., Inc.,* 200 B.R. at 53; *In re CF & I Fabricators of Utah, Inc.,* 199 B.R. at 994.

**41.** Section 1129(a)(12) of the Code provides as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

\* \* \* \* \* \*

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

11 U.S.C. section 1129(a)(12).

**42.** *See In re C n' B of Florida, Inc.,* 198 B.R. at 838.

**43.** *See* 11 U.S.C. section 1141(b) and (c). *See also In re CF & I Fabricators of Utah, Inc.,* 199 B.R. at 993.

firmed plans would in fact constitute "retroactive application" as that phrase is used in *Landgraf.* Reference to the paraded horribles, therefore, should not be seen as ground for concluding that Congress could not made the Amendment retroactive. Indeed, applying the "rational legislative purpose" test of *Turner Elkhorn* and *Pension Benefit Guaranty Corp.,* the Court surmises that had Congress wanted to give the Amendment retrospective effect, such effect would have not been constitutionally infirm—the imposition of postconfirmation quarterly fees is a rational means of generating income.[44] Rather, the upsetting effect of applying the Amendment to the cases before this Court, made more pointed by the federal law already in place, buttresses the Court's conclusion that to apply the Amendment to these cases would constitute retroactive application of a statute, contrary to the traditional presumption against retroactivity.

The Court cautions, however, that in concluding that the temporal scope of the Amendment is prospective only, the Court is *not* saying that Congress did not have the *authority* to make the Amendment retroactive, had Congress elected to do so *through the actual text of the statute.* In fact, the problems pointed out are now problems to be dealt with by bankruptcy courts, given the amendment to the Amendment. So, the parade of horribles must be shelved, and the bankruptcy courts must now use their heads to figure out how to make sense out of applying the Amendment retroactively pursuant to the now unambiguous directive of the newest version of the Amendment.

## C. The Legislative History of the Amendment—If It Mattered, Would It?

Even though the Court has concluded that, according to *Landgraf,* the legislative history of the Amendment holds *no* determinative weight with regard to rebutting the traditional presumption against retroactivity, the Court will examine the legislative history of the Amendment, merely to do as the Supreme Court did in *Landgraf*—to *reinforce* the Court's conclusion. The Court also examines the Amendment's legislative history because the U.S. Trustee and certain cases [45] have contended that while the actual text of the Amendment does not evidence an intent

---

**44.** *See, e.g., In re McLean Square Associates, G.P.,* 201 B.R. 436, 441 (Bankr.E.D.Va.1996).

**45.** *See, e.g., In re McLean Square Associates, G.P.,* 201 B.R. at 439–440 ("Nothing in either the text or the legislative history of the 1996 amendment states that Congress intended the amendment to be applied retroactively or prospectively.... [But] the Conference Report makes it clear that Congress intended the amendment to apply to all Chapter 11 cases including those with confirmed reorganization plans pending at the time of the enactment of the amended statute.... We conclude that Congress intended the amendment to apply to the debtor in this case."); *In re SeaEscape Cruises, Ltd.,* 201 B.R. at 322 ("The legislative history of the Amended Statute shows that Congress intended the Amended Statute to apply to debtors with confirmed plans as of the effective date.... Therefore, it is—ORDERED that Sea Escape is directed to pay United States Trustee's Fees for the period beginning January 26, 1996, through the end of the first quarter of 1996...."); *In re Foxcroft Square Co.,* 198 B.R. at 103 ("In reviewing the above legislative history, it is clear that Congress intended that the amended statute would apply to all pending Chapter 11 cases with confirmed reorganization plans.... Therefore, we conclude that Congress intended the amendment to apply to debtors situated like the instant Debtors."); *In re Upton Printing,* 197 B.R. at 618–619 ("This language [in the House Conference Report] supports the UST's position, and strongly suggests congressional intent to apply the amended statute to all Chapter 11 cases with confirmed reorganization plans pending at the time of enactment of the amended statute.... Unfortunately for the debtor, the plain meaning of the Conference Report provides that the new fees set forth in the amended statute are to apply to pending Chapter 11 cases with confirmed reorganization plans.... Upon review of the legislative history and applicable law, the court finds the UST's position is correct."); *In re Central Florida Electric, Inc.,* 197 B.R. at 381–82 ("After reviewing the legislative history and giving further consideration to the applicable law, the Court accepts the Trustee's position. The Conference Report indicates that the fees are intended to apply in all pending Chapter 11 cases including those with confirmed reorganization plans.... Here, Congress has prescribed the reach of the Amended Statute to include all Chapter 11 cases including all cases with or without confirmed Chapter 11 reorganization plans.... Considering the judicially approved discretion given to the enacting legislature as well as the modification of the Trustee's position, this Court concludes that any continuing retroactivity problems are eliminated by the Trustee seeking fees from the Effective Date forward.").

for the Amendment to operate retroactively, the legislative history of the Amendment is dispositive and evidences Congress' intent for the Amendment to apply to pending Chapter 11 cases with confirmed plans. Of course, other cases recognizing the prospect that legislative history in this area might affect the Court's decision making have suggested that such legislative history it is not clear.[46]

The Court's examination of the Amendment's legislative history reveals the existence of two statements which are worthy of consideration. The first statement, found in the House Conference Report under a section entitled "United States Trustee System Fund," and prepared in conjunction with the enactment of the Amendment, provides as follows:

> The conference agreement provides $102,-390,000 in budget (obligational) authority for the U.S. Trustee, instead of $101,596,-000 as proposed by the House and $103,-183,000 as proposed by the Senate. Of this amount, the conference agreement provides that $44,191,000 will be derived from anticipated offsetting collections. *In addition, under section 111, the conferees agree to include an extension of post-confirmation quarterly fee payments made under Chapter 11 as proposed in both the House and Senate bills and expect that these fees will apply to all pending Chapter 11 cases with confirmed reorganization plans.*

H.R.Conf.Rep. No. 378, 104th Cong., 1st Sess.—(1995); 141 Cong.Rec. H13894 (emphasis added).

This snippet of legislative history, from the perspective of the top of the Court's head, seems to evidence Congress' intent that the Amendment apply to pending Chapter 11 cases with confirmed plans. This provision has been interpreted by a number of cases, some deeming it dispositive,[47] and some professing to believe that this snippet itself is ambiguous, in that Congress did not hold its mouth just right in espousing this statement of intention.[48] The Court's problem with this second interpretation ("Yes, we know about it, but it is still not clear.") is that it appears to be a bit unrealistic. One supposes, for example, that the Congressional committee

---

**46.** *See, e.g., In re Beechknoll Nursing Homes, Inc.,* 202 B.R. at 262 ("Assuming, arguendo, that a resort to the legislative history is permissible for evidence of Congressional intent.... the legislative history surrounding the amendment to section 1930(a)(6) does not state that quarterly fees shall be paid by debtors with confirmed and substantially consummated plans as of the effective date of the amendment.... Even if the legislative history did so state, we would question the validity of Congress' intent in view of Congress' misconception that all cases with confirmed plans are eventually dismissed ... Accordingly, we find that amended section 1930(a)(6) should not be applied retroactively."); *In re CF & I Fabricators of Utah, Inc.,* 199 B.R. at 995 ("If this Court, even in light of the Supreme Court's admonition in *Ron Pair Enterprises, Inc.* ... considered it appropriate to review the legislative history of the Amendment, the history provides little dispositive assistance. Nothing indicates that Congress intended that the fees be applicable to confirmed cases that are not converted or dismissed, or that Congress intended to modify 11 U.S.C. sections 1127, 1129(a) or 1141."); *In re Hudson Oil Company, Inc.,* 200 B.R. at 55–56 ("This Court is convinced the legislative history does not supply the clear statement the Supreme Court has demanded before it will apply new legislation retroactively."); *In re C n' B of Florida, Inc.,* 198 B.R. at 838

("Had Congress intended to make this clear [that the quarterly fee must be paid even though the Chapter 11 case was neither dismissed nor converted and until the final decree is entered], it no doubt wouldn't have had any difficulty providing, in clear language, that this was the intention of the Amendment. Neither the text of the Amendment nor the legislative history indicates or even intimates that such was the congressional intent."); *In re Precision Autocraft, Inc.,* 197 B.R. at 905 ("We need not decide whether the 'clear statement' of intent must be contained in the text of the statute. [Footnote omitted.] Even if it is permissible to search the legislative history for evidence of congressional intent, we conclude that no clear statement exists there."). *But see In re Jr. Food Mart of Arkansas, Inc.,* 201 B.R. at 524 n. 2 ("Inasmuch as the plain language of this statute reaches an absurd result, a logical construction would require payment of the U.S. Trustee's quarterly fees until conversion, dismissal, or until entry of the Final Decree.... Termination of the fees at the point of confirmation is clearly inappropriate because by the amendment to the statute which deleted the phrase 'a plan is confirmed,' Congress clearly intended the fees to continue past plan confirmation.").

**47.** *See supra,* note 45.

**48.** *See supra,* note 46.

could have had statement read something like this:

> And we further intend that notwithstanding any intention to the contrary that might be gleaned herefrom, which alternative intentions we expressly, specifically and firmly reject in their entirety without exception, it is our intention that the Amendment be applicable to all cases pending, within which there exist confirmed Chapter 11 plans, be they of reorganization or liquidation or some hybrid thereof, and be they confirmed by means of ruling not yet reduced to final order, order signed but not entered, order entered but not noticed, order entered and noticed but subject to delay for reconsideration and/or appeal, order entered to which a request to reconsider has been filed but not acted on, but in connection with which a notice of appeal has not been filed, etc., etc., etc. [we think the drift is clear] . . . as of the effective date of the Amendment.

Were the objecting courts to have their way as to what the Committee should have said regarding whether it intended the Amendment to apply to pending Chapter 11 cases with confirmed plans, we postulate that (if Congress was doing its job, according to these courts) the Bankruptcy Code would be some 15,000—16,000 pages long (which this Court firmly rejects as a desirable objective). Moreover, the Court has examined the dictionary for the definition of "with," [49] which, in its most applicable context, means as follows:

> Having as a possession, attribute, or characteristic. . . . In the same group or mixture as. . . .

Webster's Second New Riverside University Dictionary 1324 (1984).

From the above definition it appears that the sentence "all pending Chapter 11 cases *with* confirmed reorganization plans," as found in the House Report, means exactly what it says—postconfirmation quarterly fees apply to Chapter 11 cases having confirmed plans. Therefore, standing alone, this statement by the Committee seems to mean

that at this juncture, the Committee intended for the Amendment to apply to all cases within which plans had been confirmed prior to or by the Amendment's effective date of January 27, 1996 (i.e. to all cases pending in all bankruptcy courts).

Another slice of legislative history, however, belies Congress' intent to apply the Amendment to pending Chapter 11 cases with confirmed plans. Indeed, the language regarding the application of the Amendment to cases with confirmed plans is notably absent from the following Committee statement, which accompanied section 111 itself:

> Sec. 111. —The conference agreement includes section 111 as proposed in the House and Senate bills, which extends the quarterly fee payments for debtors under Chapter 11 of the Bankruptcy Code to include the period from when a reorganization plan is confirmed by the Bankruptcy Court until the case is converted or dismissed. *The conferees intend that this fee will apply to both pending and new cases.*

H.R.Conf.Rep. No. 378, 104th Cong., 1st Sess.—(1995); 141 Cong.Rec. H13899 (emphasis added).

This second statement suggests to this Court that it is entirely possible that the bureaucrats rethought the proposition (of retroactive application) but failed to go back and make the statements in the Conference Reports consistent—or perhaps determined it to be unnecessary to make the statements consistent. This second statement, standing alone, generates the conclusion that Congress intended to make certain that the U.S. Trustee program could pick up the extra change arising from pending cases where plans would be confirmed in the future—in other words, to ward off the argument by parties in cases filed before January 27, 1996, that the Amendment applies to bankruptcy cases **filed after** the effective date only.

The Court thinks, therefore, that the legislative history is ambiguous. The two state-

---

**49.** Remember, Congress stated in the House Conference Report that it expected that the postconfirmation quarterly fees "will apply to all pending Chapter 11 cases *with* confirmed reorganization plans." *See* H.R.Conf.Rep. No. 378, 104th Cong., 1st Sess.—(1995); 141 Cong.Rec. H13894. (Emphasis added.)

ments, if looked at separately, are not squarely in support of one another. If looked at together, they do not mesh into a single directive. The statement specifically referring to the item of legislation does not direct retroactive application. The general proviso does. Therefore, though the Court agrees with the common-sense reading of those courts which find that the statute applies retroactively,[50] the Court disagrees with their finding that the general proviso is dispositive. It is at least diluted, and perhaps superceded, by the non-directive statement, and therefore the legislative history does not, even if it could, provide an unambiguous directive.

The Court does believe that the legislative history, read as a whole, does not advance the U.S. Trustee position as it is held up to do. But enough about legislative history, which cannot affect the Court's analysis, at all, anyway.

## CONCLUSION

The Court concludes that a plain meaning analysis of the Amendment leads to the conclusion that Congress indeed intended to impose postconfirmation quarterly fees in Chapter 11 cases until the earliest of when a case is dismissed, converted, or closed (after issuance of a final decree). Lacking "unambiguous directive," however, as to the temporal scope of the Amendment, the Court concludes that the *effect* of the Amendment, if made applicable to the Debtors, would operate "retroactively" as that term is used in *Landgraf.* Therefore, in accordance with the traditional presumption against retroactive legislation, the Amendment (in effect as of the entry of final decree in this case) applies to cases pending on or after January 27, 1996, only in which plans have not been confirmed.

A separate Order, the Final Decree, has been entered.

---

**50.** We think that those courts finding ambiguity in the directive statement are advancing an "obviation-of-common-sense-understanding-of-the-English-language" doctrine, which, if you think about it, should be less than endearing to those people who write laws.